## STATE OF MARYLAND *v.* BENJAMIN BARRY MAGLIANO

[No. 433, September Term, 1968.]

*Decided June 23, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Henry R. Lord, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert C. Stewart, Assistant State's Attorney for Baltimore City,* on the brief, for appellant.

*Alan H. Murrell,* with whom was *Phillip M. Sutley* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

In *Fabian v. State,* 3 Md. App. 270, 274-279, we examined the common law crime of escape, traced the history of the Maryland statutes proscribing escape and reviewed decisions of the Court of Appeals on the subject. We observed that, as developed in the common law, escape was of three kinds:

> "1. By the person that hath the felon in his custody, and this is properly an escape; and 2. When the escape is caused by a stranger, and this is ordinarily called a rescue of a felon. 3. By the party himself, which is of two kinds, viz. 1. Without any act of force, and this is a simple escape. 2. With an act of force, viz. by breach of prison. 1 Hale P. C. 590 as quoted in Perkins, *Criminal Law* (1957) Ch. 5, p. 428."

We concluded that it was the legislative intent under the statute in effect today, Md. Code, Art. 27, § 139, to create a new crime of escape, although analogous to the common law crime, and that the statutory crime encompasses both the common law "simple escape" and "breach of prison." We noted that under the statute it was also a crime to aid or assist in an escape.

In *Agresti v. State,* 2 Md. App. 278 we discussed principals in the first degree, principals in the second degree, accessories before the fact and accessories after the fact. We stated that an accessory at common law may be made a principal by statute, as is the case in arson, Md. Code, Art. 27, § 6, and burglary, Md. Code, Art. 27, § 30(a).

The statute creating the crime of escape, by providing that "[i]f any keeper, deputy, assistant keeper or other person shall aid or assist in the escape of any offender or person detained and confined * * *", as prescribed, shall be guilty of a felony, clearly includes a principal in the second degree.[1] It appears also to make an accessory before the fact a principal; one whose guilty aid was rendered before the completion of the felony is usually a principal in the second degree or an accessory before the fact, depending upon whether he was present or absent at the time. But we do not feel that the intent of the statute was to make an accessory after the fact a principal in the light of its language—"* * * aid or assist *in the escape* * * *". (emphasis supplied). Thus the aiding or assisting proscribed is not *after* the escape and a person cannot be an accessory after the fact if his guilty conduct did not occur after the commission of the felony itself.

One result of common law distinctions between principals on the one hand and accessories on the other, led to the rule that there could not be a conviction of the accessory before conviction of the principal. It has been said that "the reason for this rule is very plain. If there is no principal, there can be no accessory; and the law presumes no one guilty until conviction." *Commonwealth v. Phillips*, 16 Mass. 422, 425 (1820). Technical embarrassments to the prosecution of this kind have been obviated by legislative action in a number of jurisdictions. "It is proper to say that almost everywhere the unavailability of the principal has ceased to be a bar to the con-

---

1. The general rule is that there is no distinction between principals in the first and second degree as to indictment, conviction and punishment. *Thomas v. State*, 3 Md. App. 708, 714. Under Art. 27, § 139, the escaper shall be sentenced for such additional period, not exceeding 10 years as the court may adjudge, except for escapes from "the Maryland Correctional Institution—Hagerstown or the Maryland Correctional Training Center—Hagerstown which have not involved an assault", when the sentence shall not exceed 3 years. A person aiding or assisting in the escape of any person confined shall be sentenced, as the court may adjudge, for not more than 10 years. This part of the statute makes no exception as in the case of the escaper.

viction of an accessory before the fact." However, "[t]he distinction between the principal and the accessory after the fact has been quite generally preserved, but there has been a very definite trend in the direction of removing procedural technicalities from this branch of the law." *Perkins on Criminal Law* (1957) Ch. 6, § 8, pp. 589 and 593. Perkins found that the present state of the statutory law requires that the legislative changes in the common law rule, and the details of the trend, be spoken of as accomplishments in some states, rather than in more general terms. He said, at pages 593-594:

> "Some of these enactments, for example, provide that the accessory after the fact may be tried in any court which shall have jurisdiction of the principal felon even if the act of accessoryship was committed outside of the state, adding, sometimes, that if both events occur within the state, but in different counties, the accessory may be tried in either one. Some authorize the trial, conviction and punishment of such an accessory even if the principal 'cannot be taken so as to be prosecuted and punished,' or 'whether his principal has or has not been convicted,' or has been pardoned, or is dead, or has been acquitted." [2]

Maryland has not enacted a law changing the common law rule with regard to the conviction of a principal and accessory after the fact.

The appellee here was charged in an indictment containing one count reading as follows:

"The Jurors of the State of Maryland, for the

---

2. For examples of such legislative changes see: *The Code of Georgia of 1933*, Title 26, Ch. 26-606; *Code of Laws of South Carolina*, Annotated, Title 17, § 453; *Code of Virginia*, Annotated, Title 18.1, § 13; *The General Statutes of Connecticut*, Title 54, § 196; *Delaware Code*, Annotated, Title 11, § 103; *General Laws of Rhode Island*, Title 11, Ch. 1, § 4; *The General Statutes of North Carolina*, Ch. 14, § 7; *New Hampshire Revised Statutes*, Annotated, Ch. 590:2; *New Jersey Statutes*, Title 2A, Ch. 85, § 2; *Purdon's Pennsylvania Statutes*, Annotated, Title 18, § 5106.

body of the City of Baltimore, do on their oath present that James Vincent Galliard, late of said City, who was then and there legally detained and confined in the custody of the Warden of the Baltimore City Jail, on the seventeenth day of April, in the year of our Lord nineteen hundred and sixty-eight, at the City aforesaid, unlawfully and wilfully did escape from such legal detention and confinement, contrary to the form of the act of assembly, in such case made and provided, and against the peace, government and dignity of the State.

And the Jurors aforesaid, upon their oath aforesaid, do further present that BENJAMIN BARRY MAGLIANO, late of said City, well knowing the said James Vincent Galliard, to have done and committed the felony and escape aforesaid, in manner and form aforesaid, afterwards, to wit, on the eighteenth day of April, in the year of our Lord nineteen hundred and sixty-eight, at the City aforesaid, was accessory thereto, and he, the said BENJAMIN BARRY MAGLIANO, did then and there feloniously receive, harbor, comfort, counsel, maintain and assist, contrary to the form of the act of assembly, in such case made and provided, and against the peace, government and dignity of the State."

He was thus charged with being an accessory after the fact to the felony of escape.[3] Prior to trial Magliano filed a motion to dismiss the indictment. The motion was granted after hearing and the State appealed.

The ground of the motion to dismiss was that at common law an accessory after the fact could not, without

---

3. That this was the crime contemplated is indicated by the title sheet of the indictment which designates the crime to be "Accessory after the Fact." As this is a common law offense, there being no statute in Maryland proscribing it, the phrase in the indictment, "contrary to the form of the act of assembly, in such case made and provided", is surplusage. See *Agresti v. State, supra,* 280.

his express consent, be put upon separate trial until after the conviction of the principal, that the principal here had not been convicted of the crime of escape and in fact could never be convicted because he was deceased and that Magliano had not consented to be tried on the charge. It alleged that the common law rule was in effect in Maryland as there had been no statute enacted to the contrary. At the hearing on the motion on 17 October 1968 it was stipulated that Galliard had been in the custody of the Warden of the Baltimore City Jail, that he left that custody, that he had never been indicted for "escape", that he had not been tried or convicted of the escape and that he had been dead "at least since 20th of April" 1968. There was no other evidence offered.

In a comprehensive opinion rendered upon its dismissal of the indictment the trial court found that in Maryland escape is a statutory felony and accessory after the fact to that felony is a common law offense; that at common law the conviction of the principal was essential to the trial of the accessory and the accessory could not, without his express consent, be put upon separate trial until after the conviction of the principal; and that the common law rule is still in full force and effect in Maryland. As hereinbefore indicated, we agree that in Maryland escape is a statutory felony and that accessory after the fact to that felony is a common law offense. And it is clear that, within the provisions of Art. 5 of the Declaration of Rights of the Constitution of Maryland of 1867, presently in effect, the common law is applicable. Art. 5 declares, in relevant part:

> "That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law, and to the benefit of such of the English statutes as existed on the Fourth day of July, seventeen hundred and seventy-six; and which, by experience, have been found applicable to their local and other circumstances, and have

been introduced, used and practiced by the Courts of Law or Equity * * *." 4

The provisions of Art. 5 make a distinction between the common law of England and the English statutes. "The inhabitants of the State are declared to be entitled to the common law, without any restrictive words being used, and thus the common law is adopted in mass, so far at least as it is not inconsistent with the principles of that instrument (the Constitution), and the nature of our political institutions." *Dashiell v. Attorney General*, 5 H. & J. 392, 401. But with regard to the English statutes, the inhabitants were entitled only to those as existed on 4 July 1776 "and which, by experience, have been found applicable to their local and other circumstances, and have been introduced, used and practiced by the Courts of Law or Equity." They must not only be applicable but must have been "found applicable" or have been "introduced, used and practiced" by the courts. It would appear that the State thus claims for the courts of Maryland a final decision as to the applicability of English statutes, a clear distinction between them and the common law. See Steiner, *The Adoption of English Law in Maryland*, 8 Yale Law Journal, pp. 353-361. As to which statutes by experience have been found to be applicable, the Court in *Dashiell* said: "The only evidence to be found on that subject is furnished by Kilty's Report of the Statutes * * *. That book was compiled, printed, and distributed, under the sanction of the State, for the use of its officers, and is a safe guide in exploring an otherwise very dubious path." at 403.5 As for the common law,

---

4. Art. 3 of the Declaration of Rights of the Constitution of Maryland of 1776 differed as to the provisions here considered, only by adopting the English common law and the English statutes "as existed at the time of their (the inhabitants of Maryland) first emigration," rather than as existed on 4 July 1776.

5. In 1870, sixty years after Kilty's report, Julian J. Alexander of the Baltimore bar, published "A Collection of the British Statutes in force in Maryland, according to the report thereof made to the General Assembly by the late Chancellor Kilty, with notes and references to the Acts of Assembly and the Code and to the

294

the Court of Appeals said in *State v. Buchanan*, 5 H. & J. 317, at 356: "* * * it is to judicial decisions, that we are to look, not for the common law itself, which is no where to be found, but for the evidences of it." The concurring opinion of Chief Judge Jeremiah T. Chase,[6] stated it even more clearly, at 366:

> "I think it may be assumed as a position which cannot be controverted, and is free from doubt, that the common law of England, as it was understood at the time of the Declaration of Rights, was the law of Maryland; and I think the position is equally clear, that it must be ascertained by the writing of learned men of the profession, by the judicial records and adjudged cases of the Courts of England."

"By the writing of learned men of the profession, by the judicial records and adjudged cases of the Court of England", we think the common law rule as to trial of an accessory was clearly established. An accessory cannot without his own express consent be put upon his separate trial until after the conviction of the principal.[7]

---

principal English and Maryland cases." No official adoption of the book was made but it has been said that it is fairly certain that within its covers is the text of all the English Statute law in force in Maryland when Kilty's report was made. *Steiner, supra*, p. 361. That Kilty did not regard a statute as "applicable" did not preclude a court from having a different view. Steiner found only two cases, however, in which Kilty's opinion was overruled, *Shriver v. State*, 9 G. & J. 11 and *Sibley v. Williams*, 3 G. & J. 63.

6. "Owing to indisposition" Chief Judge Chase did not attend when the opinion of the Court was delivered in *Buchanan*. Note (a) at 362.

7. *Clark and Marshall, Law of Crimes* (6th Ed.) § 8.05, pp. 463-464 states: "At common law an accessory cannot be tried, without his consent, until the guilt of the principal has been legally ascertained by a conviction or outlawry, unless they are tried together, and then the jury must be charged to inquire first as to the guilt of the principal, and, if they are satisfied of his guilt, then as to the accessory. If the principal is dead, or if he is acquitted on this trial, the accessory cannot be tried."

*Perkins on Criminal Law* (1957) Ch. 6, § 8, p. 584, puts it: "[A]n accessory, unless he waives his right in this regard, can-

This rule was recognized by the Court of Appeals of this State in *Randall v. Warden,* 208 Md. 667 [8] and applied by this Court in *West v. State,* 3 Md. App. 662.[9]

---

not be tried before the principal * * * Anything which prevents conviction of the principal makes impossible the conviction of the accessory. Hence, if the principal is never apprehended, or if before the moment of conviction he should die or be pardoned, the accessory must go free although his guilt may be well known and easy to prove. Furthermore, if both be convicted in due course, but the conviction of the principal is thereafter reversed, the conviction of the accessory cannot stand."

In 2 *Wharton's Criminal Evidence* (12th Ed.) § 635, p. 525 it is simply stated: "* * * [A]t common law the conviction of the principal is a condition precedent to the conviction of the accessory * * *."

See 1 *Hale P. C.* 623-625; *Foster, Crown Law,* 361; *Hochheimer on Crimes and Criminal Procedure,* 2d Ed. (1904), § 27; 22 C. J. S., *Criminal Law,* § 104; 2 *Pollock & Maitland, History of English Law* (2d Ed. 1898) 509.

8. *Randall* came before the Court of Appeals on an application for leave to appeal from an order denying relief upon a hearing on a writ of *habeas corpus.* The primary ground was that the applicant, convicted as an accessory after the fact to a murder, had been tried and convicted before the alleged principal had been tried and convicted. The Court cited *Hochheimer* on *Crimes and Criminal Procedure,* 2d Ed. (1904), § 27: "At common law, an accessory cannot without his express consent be put upon his separate trial until after conviction of the principal, nor in any case sentenced until after sentence of the principal." It referred to 22 C. J. S. 177, Criminal Law, § 104 as being the same general effect, but as requiring only the consent of the accessory to trial or the conviction, rather than sentence of the principal. It stated, "The latter statement of the rule seems preferable." 208 Md. at 670. The Court found that Randall's conviction was proper within either statement of the rule, "even if the question were on which was available on habeas corpus." It appeared that Randall and his counsel had not only consented, but expressly asked, that he be tried on a date prior to the trial of the principal, who was at the time not mentally competent to be tried. Randall was convicted but not sentenced, the principal was thereafter tried, convicted and sentenced and Randall was sentenced after the principal's conviction. The Court also found that if the contention had any merit, it would appear to be open to review on appeal and no special circumstances were shown to take it out of the general rule that matters reviewable on appeal were not available on *habeas corpus.*

9. In *West* in determining that the defendant had not been denied a speedy trial, we said, "There was good reason for the delay. The State could not try West, the accessory, until the principal, Cook, was convicted in the absence of an express waiver. * * * West would not, or did not, file such a waiver. There was adequate reason for the delay in trying Cook, therefore West was not denied a speedy trial." 3 Md. App. 662 at 665. We cited

The State "readily concedes that the rule * * * was in effect for centuries in England." It claims, however, that on 4 July 1776 it had been made subject to exceptions and relies on *Blackstone, Commentaries on the Law of England* (1st Ed.) published in 1769, quoting Book IV, Ch. XXV, p. 323:

"By the old common law the accessary could not be arraigned till the principal was attainted, unless he chose it: for he might waive the benefit of the law; and therefore principal and accessary might, and may still, be arraigned and plead, and also be tried together. But otherwise, if the principal had never been indicted at all, and stood mute, had challenged above thirty-five jurors peremptorily, had claimed the benefit of clergy, had obtained a pardon, or had died before attainder, the accessary in any of these cases could not be arraigned; for *non constitit* whether any felony was committed or no, till the principal was attainted; and it might so happen that the accessary should be convicted one day and the principal acquitted the next, which would be absurd. However, this absurdity could only happen where it was possible that a trial of the principal might be had subsequent to that of the accessary; and therefore the law still continues that the accessary shall not be tried so long as the principal remains liable to be tried hereafter. But, by statute 1 Anne, c. 9, if the principal be once convicted, and before attainder (that is, before he receives judgment of death or outlawry) he is delivered by pardon, the benefit of clergy, or otherwise; or if the principal stands mute, or challenges peremp-

*Randall.* The State claims that in *West* we did not rely upon the common law rule as to trial of an accessory to dispose of the contention of denial of a speedy trial. We think it clear that it was one of the paramount factors in our determination.

torily above the legal number of jurors, so as never to be convicted at all; in any of these cases in which no subsequent trial can be had of the principal, the accessary may be proceeded against as if the principal felon had been attainted; for there is no danger of future contradiction. And upon the trial of the accessary, as well after as before the conviction of the principal, it seems to be the better opinion, and founded on the true spirit of justice that the accessary is at liberty (if he can) to controvert the guilt of his supposed principal, and to prove him innocent of the charge, as well in point of fact as in point of law."

The State construes Blackstone's language "* * * that the accessory shall not be tried so long as the principal remains liable to be tried hereafter" to permit the trial of the accessory if the principal had died before being convicted. It is aware that this exception is not one included in the statute 1 Anne referred to by Blackstone, but urges that the exceptions in the statute are merely illustrative of "cases in which no subsequent trial can be had of the principal." There are two answers to the State's claim. First, we cannot read into the statute exceptions which are not specifically set forth therein; we think the exceptions must be limited to those enumerated. Second, even if the exception could be read into the statute as the State would like, we do not find that the statute had been "found applicable to * * * local and other circumstances." We do not find it among the statutes designated by Kilty and are referred to no other authority to establish that it had otherwise been found applicable "by experience" or had been "introduced, used and practiced by the Courts of Law of Equity." Thus 1 Anne, st. 2, c. 9 would not be available in any event. On the contrary, however, Kilty found that 4 Edward 1, st. 2 was applicable to the province and proper to be incorporated. *Report of English Statutes* (1811). That statute pro-

vided that the accessory shall be kept until the principal is attainted. *Anno quarto Edwardi I* (1276) pp. 113-114. The State recognizes that the application of the rule it urges is a "narrow" one and that it is the broader rule generally cited and relied upon by the authorities. We believe that the common law rule to which the inhabitants of Maryland are constitutionally entitled is that recognized in *Randall.*

The State further urges that even if the rule be as we have found it, we should refuse to apply it. It supports this position directly on two grounds: (1) the rule has never been applied in Maryland; and (2) it is found to be inapplicable to Maryland's local and other circumstances. As to the first ground we did apply it in *West,* although not squarely on the point here presented. As to the second ground, we have hereinbefore pointed out that the restrictive words in Art. 5 apply to English statutes and not to the common law, which was adopted in mass. The State supports its position also by claiming that the rule "is entirely inappropriate to the fabric of the criminal law of Maryland;" by applying it we "would introduce a hollow anachronism into the law of this State." In its brief it examined at length "the tortuous development of the rule." It concluded: "The rule evolved from a theory of criminal liability adopted in Roman law and now discredited; its use was continued in medieval England as a 'device' to mitigate the harsh punishments (often death) meted out to accessories to felonies; and it prevented the English system of justice 'from producing self-contradictory results.' With this background, the early history of Maryland was examined by way of contrast. It was seen that the common law of England was 'often entirely neglected' by the colonists; that harsh penalties for crimes were abhorred by the General Assembly; and that the strong religious overtones of the criminal law of England were not present in Maryland." Perkins in his *Criminal Law* (1957) agrees in substance:

"The ends of social discipline will be best

served by abrogating entirely the distinction be-
tween the accessory before the fact and the prin-
cipal, by removing procedural technicalities from
the prosecution and conviction of the accessory
after the fact, by providing milder penalties for
such a party, and by excluding from this type
of accessoryship those who are intimately re-
lated to the principal." Ch. 6, § 8, p. 595.

It may well be that the common law rule should be modi-
fied. Assuming that it should, the question is whether
this may be properly done by judicial decision or whether
it should be the province of the legislature. The State
suggests that the courts may do it. It quotes from *State
v. Buchanan, supra,* at 365-366:

"Whether particular parts of the common law
are applicable to our local circumstances and
situation, and our general code of law and ju-
risprudence is a question that comes within the
province of the Courts of justice, and is to be
decided by them * * * [N]o great inconve-
nience, if any, can result from the power being
deposited with the judiciary to decide what the
common law is, and its applicability to the cir-
cumstances of the State, and what part has be-
come obsolete from *non-user* of other cause."

Aside from the fact that the quote, contrary to the indi-
cation by the State, does not appear in the opinion of the
Court, but in the concurring opinion of Chief Judge
Chase, there is omitted, immediately preceding the last
sentence as quoted by the State, and part thereof, the fol-
lowing:

"The common law, like our Acts of Assembly,
are subject to the control and modification of
the legislature, and may be abrogated or
changed as the General Assembly may think

most conducive to the general welfare; so
* * *."

The rule as to trial of accessories is no longer the law of England, but it was abolished by Act of Parliament. Accessories and Abettors Act, 5 *Halsbury's Statutes* (2d Ed.) 725-726 (1861). And, as we have noted, it has been modified in most of the common law states, but also by legislative action. These statutory changes have effected modifications in various degrees and in divers ways; there has been no substantial uniformity. We feel that an examination of the principal-accessory relationship in the criminal law, involving, as it does, consideration and determination of such procedural questions as where an accessory may be tried and under what circumstances — should trial, conviction and punishment of an accessory be authorized even if the principal cannot be taken so as to be prosecuted and punished, or whether his principal has or has not been convicted, or has been pardoned, or is dead, or has been acquitted, for example—is properly a legislative function. For us merely to abrogate the rule that an accessory cannot be tried until his principal has been convicted would leave all of these procedural technicalities unanswered. They should be answered, as should substantive questions involved—for example the culpability of an accessory standing in certain degrees of consanguinity of affinity to a principal and the punishment of an accessory by the legislative process, enabling the public to be heard as to what is deemed to be best in the general scheme of social discipline and in the general welfare. We observe that in *Oden v. State,* 222 Md. 325, the Court of Appeals, keenly aware of the problems inherent in the felony-misdemeanor distinction in Maryland as it affected the law of arrest, stated that they could be dealt with by legislative, but not by judicial action, a position affirmed in *Goad v. State,* 239 Md. 345, and noted by us in *Robinson v. State,* 4 Md. App. 515. We may interpret, construe and apply the law but we may not enact it. Until the General Assembly changes the common

law rule we have here found to be applicable, we shall apply it.[10] In so doing we hold that the lower court did not err in dismissing the indictment against the appellee.

> *Order affirmed; costs to be paid by the Mayor and City Council of Baltimore.*

---

10. It is, of course, arguable that the common law rule safeguards substantial rights of an accused as distinguished from technicalities of purely historical significance. At the trial of the accessory the principal's guilt must be proved, even where a statute allows an accessory to be tried before conviction of the principal, for "no man can be an accessory to a crime which has never been committed." *Clark & Marshall, Law of Crimes, supra,* § 8.05, p. 464. Blackstone said, as hereinbefore quoted:

> "And upon the trial of the accessary, as well as after as before the conviction of the principal, it seems to be the better opinion, and founded on the true spirit of justice, that the accessary is at liberty (if he can) to controvert the guilt of his supposed principal, and to prove him innocent of the charge, as well in point of fact as in point of law."

To permit the trial of the accessory after the fact subsequent to the death of the principal precludes even the possible availability of the principal to testify in the accessory's attempt to controvert the guilt of the supposed principal. The appellee urges that "* * * the paramount, and in all likelihood only, witness the accessory could produce to establish the principal's innocence would be the principal himself."