DOROTHY HANDY AND CARLO BUCCI v.
STATE OF MARYLAND

[No. 110, September Term, 1974.]

*Decided October 21, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN and GILBERT, JJ.

*E. Thomas W. Stahl* and *Victor B. Sobotka* for appellants.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City* and *Gerald Glass, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

DOROTHY HANDY and CARLO BUCCI were jointly tried at a bench trial in the Criminal Court of Baltimore on charges relating to the gambling laws. Handy was convicted of four offenses and Bucci of thirteen. Consecutive fines of $250 and costs were imposed on each conviction. Both appealed.

I

The charges against appellants were filed in the District Court, which was deprived of jurisdiction upon demand of the accused for a jury trial. Courts Art. § 4-302 (d). Handy was convicted under an arrest warrant and three statements of charges. Bucci was convicted under thirteen statements of charges. Maryland District Rule 702 a. The charges were all of the same nature. Both Handy and Bucci were accused of aiding and abetting violations of the bookmaking laws of Maryland as prohibited by Code, Art. 27, § 240. Handy was charged with aiding and abetting one William Crofoot (also

sometimes spelled Crowfoot) to violate said laws on the 13th, 20th and 27th days of September and the 4th day of October 1973. Bucci was charged with aiding and abetting Crofoot to violate said laws on the 17th and 19th days of September and the 2nd day of October 1973, aiding and abetting one Salvatore D'Amico to violate said laws on the 11th, 14th, 17th, 18th, 22nd, 24th, 26th, 28th and 29th days of September 1973 and aiding and abetting Crofoot or D'Amico to violate said laws on the 15th day of September 1973. The charging documents set out that the accused "Was overheard to commit the below stated crime over the telephone number 685-9264 at 847 Fawn Street, Baltimore, Maryland. This interception was made pursuant to the execution of an Order of the Honorable Charles D. Harris, Dated September 10, 1973." Copies of the Petition, Affidavit and Ex Parte Order were incorporated in the charging document by reference.[1]

## II

The State's case was presented on a statement of facts. The Assistant State's Attorney gave the court the following "factual basis" for the charges placed against the accused:

"On September 10th, 1973 Judge Charles D. Harris of the Criminal Court of Baltimore City signed an ex parte order authorizing the interception of oral communications over telephone number 685-9264 which telephone was subscribed to by the Little Italy Democratic Club and is physically located at 847 Fawn Street, Baltimore, Maryland. Interceptions commenced on September 11, 1973 and terminated on October 4th, 1973. During that period of time conversations involving the defendants before you were intercepted and recorded specifically for the charges placed or being tried at this time. Conversations involving Carlo Bucci were intercepted on September 11th, 14th,

---

1. The wiretap order was not challenged. At trial it was stipulated that the order and the petition and affidavit supporting it were "proper", and they were not offered in evidence.

17th, 18th, 22nd, 24th, 26th, 28th, 29th, 17th, 19th, and the 2nd of October. Conversations involving Dorothy Handy were intercepted and recorded on September 13th, September 20th, September 27th, and October 4th. The general pattern of activity as observed by the electronic surveillance of the above listed telephone number was as follows. Everyday, Monday through Saturday, at approximately twelve p.m. the telephone 685-9264 began to be used to receive calls involving wagers placed upon horse races that were occurring either in Florida, Maryland, Delaware, New Jersey and other tracks that were located in the United States of America. During the course of the day there would be an incoming call placed to 685-9264 which would be a one ring call. After one ring the call would stop and immediately thereafter on most occasions an outgoing call was then placed by a person from 685-9264 to a number 744-9010. The records of the telephone company would reflect that the number 744-9010 is located at 709 Frederick Road and is subscribed to by the Acme News Service. The general pattern of activity after the call was placed to 744-9010 is as follows. A person either identified as Salvatore D'Amico or William Crowfoot would make a statement to the person answering the phone at the Acme News Service either by voice recognition or by beginning the statement what do you have or do you have a result of a certain race. The person on the other end would then give information which included the scratches for the day at certain race tracks, the post time at certain race tracks, if a race had been completed, the winning horses by number and amounts paid. The State wishes to bring to the court's attention the significant part of the information provided by the sports service is the amounts of money which were paid which on every date that the State has called included the term the limit. For example, if a horse would pay $2.40 the person giving the information

in the Acme News Service would say two forty, one eighty, whatever it would be. However, on every date which the State has later charged, the person giving the information would give some monetary figures but also the term the limit. The State has available to testify persons who have participated in the investigation who have had experience both practical and educational in the field of bookmaking and persons that would testify would state to His Honor that the term the limit has only one application to a horse racing industry. That term is to advise a bookmaker as to the maximum amount of money that should be paid out by the bookmaker on a bet that had been taken by the bookmaker. For example, experts, including Michael Gray, of the Baltimore City police are assigned now to C.I.D. Vice would testify that normally with the bookmaking operation in Baltimore City, there is a limit that a bookmaker will pay out on a daily double. The maximum odds normally paid out by bookmakers on the daily double would be fifty to one odds. The maximum that would be paid out by a bookmaker on a race other than a daily double would be approximately twenty to one odds. The difference in five one compared to two one is that in a daily double you have to have two winning numbers in the first and second race which decreases your chance of winning and the bookmaker would be free to give the higher odds with the less expected chance of paying out on those odds. Every call would indicate what post time was involved with a particular race. Now, the terminology used would be testified to by Michael Gray and others is that it was very important to a bookmaker to know if the post time had already elapsed or if it was coming up. The term for example, fifty-three was, means that the post time when the race went off, for example, was two fifty-three. The term fifty-three is means, for example, a race will go off at two fifty-three. The

244

importance of the stating of the post time — I don't know if His Honor saw the Sting or not — but the purpose of stating the post time is to prevent a bookmaker from being stuck with bets taken in after the horse race has either started or has been completed. For example, this would be evidenced by certain calls in which Mr. Bucci was a participant. For example, on 9/22/1973, Salvatore D'Amico was talking to Carlo Bucci about a bet that he thought occurred with the post time at fifteen after the hour when, in fact, there was some discussion as to whether or not it was eighteen after the hour. Salvatore D'Amico had been taking bets up to eighteen after the hour which meant that the race really took off at a quarter after the hour and he was stuck with several bets on winners that had already run. Mr. D'Amico got very excited when he found out that the true time was at fifteen after instead of eighteen after and he told Mr. Bucci, well, whoever placed the bet, he ain't got no fucking bet. He was very upset that he had taken past posted bets. On other occasions the same conversation between Mr. Bucci and Mr. Salvatore D'Amico with reference to past posting of times occurred on 9/26/73, call number twenty-eight, in which after finding out the correct post time or the time of the race, Mr. D'Amico exclaims to Mr. Bucci, again using similar language, that the person doesn't have any bet. On 9/18/73, a call twenty-four, Mr. Bucci is talking to Mr. D'Amico in which Mr. Bucci asks what horse has to be bet in and which Mr. Salvatore D'Amico tells him that he will break even on a certain race that they were discussing at the time. On 9/23/73 Mr. Bucci checks his personal betting figure with William Crowfoot and finds he is down approximately $30.00. Mr. Crowfoot informs Mr. Bucci that he hopes Mr. Bucci wins because they, Crowfoot and D'Amico, don't want Bucci's money. There was discussion on 9/22/73, call number fourteen, in which Mr.

D'Amico was talking to Mr. Bucci as to the working schedule of both Mr. Bucci and Miss Handy. There seems to be a problem with Miss Handy as the person who gives the race results because Mr. D'Amico is very upset that she would be working say on a Thursday. Mr. D'Amico said he worked everyday except Thursday because the last time in reference to the lady or to the effect that the lady caused him $7200 worth of play. He lost that when she was working the phones that day. There were occasions in which Mr. Bucci and Mr. Crowfoot were talking, specifically on 9/23/73, call number twenty-one, in which Mr. Bucci was joking about the possibility of hitting the daily double himself that he played with the bookmakers at the Casa Bianco and Mr. Crowfoot tells Mr. Bucci, well, it looks like he is the only one that is not going to hit the daily double to which Mr. Bucci explains, well, I had the first horse already. On 9/21/73, call number twenty-four, Mr. Crowfoot talks to Mr. Bucci about beginning a service with the person known as Walt. This person, Walt, had conferred with both D'Amico and Crowfoot with regards to obtaining the wire service from Acme News. The person referred to as Walt had a guilt complex. He was calling in getting free service when, in fact, he should have been paying for this service. Mr. Bucci informed Mr. Crowfoot to have Walt give him a call at the service so they could start billing him for the service. Periodically throughout the day the bookmakers would also have information or a need to know what the amount of money was placed on certain bets so there could be a determination of three digit illegal lottery number posted. During the course of the day both Mr. Bucci and Miss Handy would inform the caller as to what digit was up. So far the references would be that the first girl is nine. The second girl is a three or nine across or whatever and there would also be some type of coding system. They would ring at the Casa Bianco

at which time no one answered and then a call back to the sports service. On occasion Salvatore D'Amico would have a conference with the person answering the sports service line saying that he got the signal but he didn't need anything so he didn't call back. So, the important things for the court to take into consideration are one the signal arrangement that the legitimate sports service has with its customers, a one call to the recipient followed by a return call to the sports service, the posting time so there would be no acceptance of bets after a horse was run, the term the limit. Now, counsel has, I think, it is a News American paper with him. Why don't you show the court all of the figures in the News American and I would venture to say that — I didn't look at it that carefully — but I doubt if there is any term the limit anywhere.

\* \* \*

They [the newspapers] would give the [parimutual] results. The limit refers to the result that the bookmaker shouldn't pay out over certain odds.

\* \* \*

All right, the counsel for the defense wants the State to put on the record that the bets of Mr. Bucci, in fact, placed were not made from Acme News. Since the State employed what is known as a touch tone decoder and a pen register, we only know the calls that were made out to a certain number. The State cannot dispute the fact as to Mr. Sutley's [defense counsel] position that he might have called from his personal home. The thing the State wants the court to take into consideration is that the calls by Mr. Bucci occurred with reference to his bets in the early morning hours of the day in

which he might have been working that day, but he did talk to the same people that he gave the results to. I think basically that would be the statement of facts showing the allegations at the Acme News Service by way of Miss Handy and Mr. Bucci, in fact, were aiding and abetting the gambling operation located at the Casa Bianco Restaurant."

Defense counsel denied that there was a signal given. His point was that it was not shown who placed the unanswered one ring call.

Larry D'Anna, who identified himself as the President and the owner of Acme News Service, a corporation, testified on behalf of appellants. He described in general what Acme News Service does. "We give out racing news. We are not a wire service. We give out news after the event is over. . . . Racing news. We give out racing news, basketball scores. At one time we printed a racing, not a racing sheet, but a sports news sheet with our number on it." He denied that they gave any "pre bet information". He was asked to describe the difference between pre bet information and post bet information. "Pre bet information I would have to say is aiding and abetting for the simple reason they give you odds, change of jockeys, scratches, prior to any race being run. They give you all types of information. You can call, I guess, the Sun and you can get or see the news in the morning. They give you odds." He claimed that Acme's employees were supposed to give out "the one, two, three of a race result and the total mutual." Asked where Acme got the information, he said, "We have numerous radio stations that we pick up on tape and then we play it back and put our numbers on it." He mentioned local stations and stations all over the country that give out race results, some as often as every fifteen minutes. He denied categorically that Acme took wagers or shared in the proceeds of any bookmaking operation. He said the number of Acme's customers varied between twenty-five to "maybe" forty. "They send us money orders. Well, the way we get them actually is through our telephone number which has been advertised on our sheets. People call us and naturally

word of mouth and the public can call us at any time that they desire to have service. We say, well, we will give you service if you send us a money order or mail us the money and we charge them so much a week or if they want to come in just for one day we charge them daily." He was asked how a customer is identified when he calls and asks for the service. "How can you prevent just anybody calling up off the street and getting the service. How do you prevent that?" He replied: "We don't prevent it. It is something that you just can't control. It is pretty hard to. They identify themselves. Some of them give us their names. Some wish to remain anonymous so that is their privilege. We are not interested in that, sir. The only thing we are interested in is getting our money at the end of the week and if they pay, they get service. If they don't pay, they are not to get no service. . . . It is a personalized service and they can call at any time they wish. They could easily listen to a radio all day but if they call at five o'clock the radio can't give them the daily double or something like that. So, it is just a personalized service they can call. It is a convenience for anyone who wants it to call at any time of day just to inquire what they want." He observed that there were other organizations offering the same service, one of which was Armstrong Daily in New York.

On cross-examination he asserted that Acme kept very "good records". "We have their names and whatever code they give us and we write their code names, numbers, down whatever they desire to be called." The transcript reads:

"Q. Where are those records kept?
A. Where are they kept? They are kept in a book.
Q. Where is the book kept?
A. Where is the book kept?
Q. Where is the book kept?
A. In the office.
Q. Where is it now?
A. Where is it now? The United States government has all of my records."

Asked to list Acme's customers, D'Anna became evasive. He said he did not keep the records — "I don't ever go in the office. I have these people that run my office and the only time I go in is when it is necessary for me to fill in for somebody if they are sick or something." He could probably name a few. "We have a Clyde that wishes to be called Clyde. We have a number ten, something like that. That is so on and so forth." Miss Handy and Acme's bookkeeper, Sigel & Milstein, take care of the records of the company. He was queried about the charge for the service:

"Q. And how much do you charge for say two, Clyde, and ten to call in and use the service?

A. It varies. If they come in for one day, the charge is $10.00 a day. We charge from twenty-five to thirty dollars a week.

Q. And who collects the money.

A. No one collects the money. They send us money orders.

Q. And where are they mailed to?

A. They are mailed to 709 Frederick Road, 21228.

Q. Do you have a billing system?

A. We have a checking account at the First National Bank."

He did not know what Acme's employees said over the telephone — "I am never there." There were two other corporate officers, Bucci, the Secretary, and a Melvin (Ike) Smith, who was vice-president but had left the company.

Dorothy Handy testified that she was employed by Acme as a bookkeeper. She worked two days a week, Thursdays and Saturdays, "on the phones", giving racing results which she got "off of the radio." She did not know what the term "the limit" meant or in what context it was used in her work, except that it required less talking — ". . . we do so much talking during the course of the day that we try to save our breath as much as we possibly can." She denied that she shared in the proceeds of any wagers or that bets were placed at Acme. On cross-examination she conceded that the

term "the limit" was used in the normal course of the business and that the post time was indicated. "Was" a certain time meant the race had been run at that time; "is" a certain time meant the race was to be run at that time. She did not know why the time was given. "It is like I said before that is the way they have always been giving races out. This is the way I was taught." She was not aware of a signal arrangement.

Bucci testified that he had been employed by Acme "about seven years on and off." He was not aware of a signal arrangement with any of the customers. He simply got race results off the radio and "when someone calls I give it out." He denied that any bets were placed at Acme or that he shared in the proceeds of any bookmaking establishment." On cross-examination it was elicited that he worked five days a week and sometimes six. He had Thursday off, on which day Miss Handy took his place. He knew D'Amico and Crofoot. "They were friends. They weren't paying customers." He had known Crofoot for about 10 years and D'Amico for about 15 years. They own the Casa Bianco bar. He used the limit "to save some of the voice . . . The limit would be — It means the horse paid a lot of money. It would have to be at least over $100.00 to $600.00. There is a limit." He admitted there is no limit "put on" at a track. Nor had he ever seen "the limit" on a scratch sheet, or in the newspapers giving race results. He informed Acme's customers what post time "is" and "was". He claimed he made "his own posts. I am guessing. I can say like you said before they went nineteen or eighteen you said and he said it went fifteen. I wasn't sure they went eighteen." But in any event it was correct that he "made the post."

### III

Aiding and abetting violations of the bookmaking laws as prohibited by Art. 27, § 240 is not an independent crime in this jurisdiction.[2] We are aware of no "aider and abettor" statute. Maryland follows the common law that all

---

2. Appellants do not question the propriety of the charging documents.

participants in misdemeanors are principals. *Broadway v. State,* 23 Md. App. 68. See *Novak v. State,* 214 Md. 472. Whatever makes one a principal or an accessory before the fact in felony makes him a principal in misdemeanor. *Hochheimer's Criminal Law* (1st ed.) § 30. We said in *Agresti v. State,* 2 Md. App. 278, 280:

> "Principals in the first degree are those who commit the deed as perpetrating actors, either by their own hand or by the hand of an innocent agent. Under common law, persons present, actually or constructively, aiding and abetting the commission of the crime, but not themselves committing it, are principals in the second degree, provided there is a guilty principal in the first degree. Accessories before the fact are those persons who procure, counsel, or command the deed perpetrated, but who are not present, actively or constructively, at such perpetration."

Although the ancient authorities regarded persons aiding and abetting in the commission of a crime as accessories at the fact, it seems that in order to avoid the technicalities of the law, aiders and abettors were early held to be principals in the second degree. 22 C.J.S. § 85; *Commonwealth v. Knapp,* 9 Pick. 496, 20 Am. D. 491. An aider is one who assists, supports or supplements the efforts of another in the commission of a crime. An abettor is one who instigates, advises or encourages the commission of a crime. *Coleman v. State,* 209 Md. 379; *Seward v. State,* 208 Md. 341; *Anello v. State,* 201 Md. 164; *Polisher v. State,* 11 Md. App. 555; *Foster v. State,* 11 Md. App. 40. We declared in *Polisher,* at 590, "So in a misdemeanor a person may be chargeable as a principal if he performs some act or takes some part in the commission of the crime or owes some duty to the person in danger."

As an aider or abettor is a principal in the second degree, the rules governing principals in the second degree apply to aiders and abettors. As to indictment, conviction and punishment, there is no distinction between principals in the

first and second degree. *Thomas v. State*, 3 Md. App. 708, 714, citing *McEntire v. State*, 2 Md. App. 449, 453. But it is axiomatic that in order for a person to be a principal in the second degree, there must be a crime committed and a principal in the first degree, and it must be shown that the person aided or abetted was connected with the offense. As indicated, we pointed this out in *Agresti v. State, supra,* at 280, and we said in *McEntire v. State, supra,* at 453, under the authority of *Vincent v. State*, 220 Md. 232: "A principal in the second degree can be found guilty of the offense the actual perpetrator thereof commits." A principal in the second degree, however, may be tried before a principal in the first degree and may be convicted of a higher degree of crime. *Hochheimer's Criminal Law* (1st ed.), § 38. We followed this rule in *Jeter v. State*, 9 Md. App. 575, 582, holding that the subsequent acquittal of a principal in the first degree does not affect the prior trial or conviction of a principal in the second degree. Our holding was expressly affirmed by the Court of Appeals on certiorari, 261 Md. 221, 223.[3]

## IV

It follows from what we have said that for Handy and Bucci to be validly convicted of the charges against them [4] the State had to produce evidence sufficient in law to show that Crofoot and D'Amico committed an act prohibited and made a misdemeanor by Code, Art. 27, § 240 and that Handy and Bucci aided or abetted therein. Code, Art. 27, § 240 creates four separate offenses. See *Miggins v. State*, 170 Md. 454. The section makes it a crime to:

1) gamble in any manner or by any means;
2) make book on a contingency of any kind;
3) keep any place on land or water in Maryland for the purpose of gambling;

---

**3.** Compare with the rule as to an accessory after the fact as set out in *State v. Magliano*, 7 Md. App. 286.

**4.** The import of the charges was that the accused committed an act prohibited by Code, Art. 27, § 240.

4) receive, record, or forward any bet.[5]

We think that the evidence adduced by way of the statement of facts was legally sufficient, directly or by rational inference, for the trial court to find that Crofoot and D'Amico were making a book on the results of running races of horses on the dates charged with one exception we shall later point out. In fact, we do not gather from the record and argument that appellants either below or on appeal claim to the contrary.[6] The trial judge, as the trier of fact, had no difficulty in determining that Handy and Bucci were aiding in the commission of the crimes. It was "obvious" to him that Acme, having only 25 or 30 customers after being in business for 12 years, had "a specific type clientele that need this type information, specifically as to when the race goes off, . . . [and patently as to the limit to be paid] to protect the bets being made." The exception concerns the charge against Bucci under date of 15 September 1973, statement of charges, #174670, docketed in the Criminal Court of Baltimore as "Warrant No. 47400197". The statement of facts given by the State omitted mention of a telephone conversation involving Bucci on 15 September

---

5. Art. 27, § 240 reads:

"It shall not be lawful for any person or persons, or association of persons, or for any corporation within the State of Maryland, to bet, wage [wager] or gamble in any manner, or by any means, or to make or sell a book or pool on the result of any trotting, pacing or running race of horses or other beasts, or race, contest or contingency of any kind, or to establish, keep, rent, use or occupy or knowingly suffer to be used, kept or rented or occupied, any house, building, vessel, grounds or place, or portion of any house, building, vessel, grounds or place, on land or water, within the State of Maryland, for the purpose of betting, wagering or gambling in any manner, or by any means, or making, selling or buying books or pools therein or thereon upon the result of any race or contest or contingency, or by any means or devices whatsoever, to receive, become the depository of, record or register, or forward or purpose, or agree or pretend to forward any money, bet, wager, thing or consideration of value, to be bet, gambled or wagered in any manner, or by any means or device whatsoever, upon the result of any race, contest or contingency, . . . ."

6. In oral argument before us counsel for appellants said that the real issue in the case was whether a person could lawfully republish the results of a sporting event to a known gambler.

1973.[7] Therefore, there was no evidence regarding that charge. With that exception, we cannot say that the trial judge was clearly erroneous in his judgment on the evidence. Maryland Rule 1086. He was not obliged to believe the ingenious but far-fetched explanation offered by the defense as to the meaning of the term "the limit", or the denials regarding a signal arrangement and concerning the giving of pre-race information. *Williams v. State*, 5 Md. App. 450. Except as to "Warrant No. 47400197" against Bucci pertaining to 15 September 1973, appellants' contention that the evidence was insufficient to sustain the convictions is without merit.

V

Appellants contend that their convictions infringe upon the constitutional guarantees of free speech. The prohibition in the 1st amendment to the federal constitution against abridging the freedom of speech and the provision in Art. 40 of the Declaration of Rights of the Maryland constitution ". . . that every citizen of this State ought to be allowed to speak, write and publish his sentiments on all subject . . ." do not establish an absolute right. *Freedman v. State*, 233 Md. 498, rev'd on other grounds, 380 U. S. 51. We observe that the Maryland provision, not to be interpreted differently from the federal version, *idem*, contains the caveat that the citizen is to be responsible for the abuse of that privilege. We are aware of no authority holding that speech which aids or abets the commission of a crime is within the protection of the constitutional guarantees. The two cases suggested by appellants, *Cohen v. California*, 403 U. S. 15 and *United States v. Spock*, 416 F. 2d 165 (1st Cir. 1969) are patently inapposite in fact and law. We hold that the convictions here did not infringe upon the constitutional guarantees of free speech.

---

7. We note that in the statement of facts as transcribed, the date 17 September 1973 is repeated. Whether this is a typographical error or whether the 15th of September was omitted by inadvertence by the State, we do not know. We are obliged to go by the record submitted to us.

## VI

Appellants lastly claim that Code, Art. 27, § 240 is unconstitutionally vague. The point was not raised below and is not properly before us. *Hallengren v. State,* 14 Md. App. 43; *Vuitch v. State,* 10 Md. App. 389. We do not consider it.

> *As to Dorothy Handy: judgments affirmed; as to Carlo Bucci: judgments affirmed except that under warrant No. 47400197 (statement of charges No. 174670) which is reversed and remanded for a new trial; appellants to pay costs.*