473 A.2d 903

Annette Louise STEBBING

v.

STATE of Maryland.

Nos. 35, 103, Sept. Term, 1981.

Court of Appeals of Maryland.

April 16, 1984.

Motion for Reconsideration Denied May 24, 1984.

332

George E. Burns, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender and Gary W. Christopher, Asst. Public Defender, Baltimore, on brief), for appellant.

Patricia E. McDonald and Deborah K. Chasanow, Asst. Attys. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

RODOWSKY, Judge.

Appellant, Annette Louise Stebbing (Annette), was found guilty at a jury trial of murder in the first degree, rape in the first degree, robbery and first degree sexual offense. She elected to be sentenced by the court. A death sentence was imposed. The crimes occurred on April 9, 1980 in the back of a van parked in an isolated area of Harford County. Only Annette, her husband, Bernard Lee Stebbing (Bernard or Lee), and the victim, Dena Marie Polis (Dena), were present. Bernard did not testify at trial. The State's case was based upon statements by Annette and on physical facts. On this appeal and mandatory review, Annette raises points which go to the guilty verdicts and to the death sentence.

Annette at age 18 had married Bernard in August of 1979. Bernard is 19 years her senior. He is a self-confessed alcoholic who was then on probation for a sex crime involving a female minor. Dena, who was 19 years old at her death, was the stepdaughter of Bernard's brother and the daughter of Edna Stebbing (Edna). Edna was separated from her husband. Edna and Dena lived on South Marlyn Avenue in the Essex section of Baltimore County. Bernard and Annette visited from time to time at Edna's home. Annette was friendly with Dena, and Bernard lusted for Dena. About one week before the murder, Bernard told Annette that he wanted to "screw" Dena. On Saturday, April 5, 1980, while Bernard and Annette were visiting at

Edna's home, Bernard "grabbed [Dena] from the front." Dena started hitting Bernard, kicking him on the shins and gouging him in the shoulders with her nails. She told him "'don't you ever touch me like that again.'"

On Wednesday, April 9, at about 4:40 p.m., Edna came home from work and found Bernard, Annette and Dena there. Dena was planning to visit her boyfriend in Glen Burnie. Bernard and Annette were to drive Dena into downtown Baltimore City where Dena was to get public transportation to Glen Burnie. At Edna's home Bernard told Annette, when no one else was present, that "he was going to screw [Dena] that night." The trio left in Bernard's employer's van. There were only two seats in the van. Bernard was driving, and Dena, who was five feet two inches tall and weighed 104 pounds, was in the passenger seat. Annette, who was five feet five inches tall and weighed 155 pounds, was behind them.

What thereafter transpired is described in Annette's statement to the Baltimore City police given on April 19, 1980:

[W]e started out for Harford County. We went to Phil. Rd. and went North. Lee pulled over about eight miles. Lee said that the oil was low. He checked the engine and keep [sic] saying to me, "Do it" "Do it." So I put my arm around [Dena's] neck and pulled her to the back of the Van. Lee got into the Van, and Dena was yelling, "Lee stop her." Lee pulled her clothes off and Lee had sex with her. Then I started strangling her, she was fighting with me and [scratched] me on the left hand. I strangled her until there was no life in her. . . .

Q. What kind of sex did Lee have with Dena?

A. Everything, intercourse and rectum.

. . . .

Q. What were you doing when Lee was have [sic] sex with Dena?

A. I was sitting on her chest, between my legs. I had my legs over her arms, pinned down and I had my hands around her neck. Dena started screaming and I pressed

down on her throat and she stopped breathing, and blood came out of her nose and she choked on her blood.

Q. How was Lee able to screw Dena up the rectum while you were on her chest?

A. Lee told me to turn her over that he wanted to fuck her up the ass. I lefted [sic] up and turned her over, with Lee's help and I was still strangling her around her neck. After she was turned over Lee fucked her up the ass. During the time Lee was screwing her Lee got his rocks off two times.

Annette later told the police that Lee " 'thought it was funny when he was having sex with [Dena].' "

Bernard did not want to take the time to dress Dena's partially unclothed body. With the corpse covered by a blanket in the back of the van, they returned to Bernard's mother's one-bedroom apartment in Essex where they had been occupying the living room as their residence.

Annette's account of the balance of the night of April 9–10 is set forth in the report of her psychological expert which was placed in evidence at the sentencing stage.

Annette got out of the van and went into the house to get something to eat. As soon as she left the van Lee locked all the doors. Sometime later Annette returned to the van and apparently startled Lee who she states was in the back of the van with [Dena]. She states "I saw her uncovered from the blankets." According to Annette "I don't know what he did." Asked by the examiner what Lee might have been doing with [Dena's] body uncovered, she spontaneously replied "He could have screwed her when she was dead."

After giving Lee something to eat in the van she indicated that the two of them drank more beer. She states "he fell asleep in the back of the van with the girl" who was still uncovered. She herself remained sitting up in the passenger seat in the front of the van through the night.

On Thursday, April 10, Annette and Bernard went to work with the body in the van. His job was installing floor tile and Annette was his helper. In the course of the day they threw Dena's pocketbook and shoes into the dumpster at their employer's place of business. They left work early that day and drove around the waterfront of Baltimore City until dark. Then they stuffed Dena's body head first through a manhole into a sewer. At some point they threw Dena's dungarees, white sweater and panties into a dumpster behind a 7-Eleven in eastern Baltimore County.

In the evening of Thursday, April 10, Annette and Bernard went to Edna's home to pick up some money from the sale of a sword that Edna had sold for Bernard. They arrived around 8:00 p.m. and stayed until about 12:30 a.m. Edna had already notified the Baltimore County police that Dena was missing. Edna's sons, Gus and Dennis, his girl-friend, and Edna's daughter Vickie were there at various times during the evening. Conversation centered on where Annette and Bernard had last seen Dena and on what Dena had been wearing. When Gus said to Edna " 'Mom, why don't you face it, she is dead,' " Annette jumped up and said " 'Gus, you shouldn't talk to your mother like that. She is upset enough.' "

Dena's body was found in the sewer on Friday, April 11, at 7:00 a.m. The corpse was taken to the Medical Examiner's Office. There an attendant in the course of removing Dena's blouse and thermal undershirt noticed a brown button fall from within the clothing. The button was preserved as possible evidence. Identification of the body was made by 12:30 p.m. that day.

When Edna learned that Dena was dead, Edna became hysterical. She was taken to her daughter Vickie's house. Many friends of the family visited there that evening. Annette and Bernard came as well. Annette walked over to Edna and hugged and kissed her. Bernard walked over to Edna and hugged and kissed her. When Annette and Bernard were getting ready to leave, Edna walked out to the

kitchen with them. They were consoling her. Annette hugged Edna and said, " 'You take it easy now, because everything is going to be all right.' "

The break in the murder investigation came on April 19, 1980. Annette and Bernard had gone to the Baltimore City Police Headquarters where they gave exculpatory written statements. Bernard then consented to a search of the van which was parked nearby. During that search Detective James Ozazewski noticed that a brown button was missing from the yellow shirt which Bernard was wearing and recalled the brown button found at the Medical Examiner's. With Bernard's permission, a laboratory examination of the shirt was immediately performed. Because the buttons on Bernard's shirt matched the button found with Dena's body, Bernard and Annette were taken to separate rooms, advised of their rights, and questioned further. Detective John Hess questioned Annette. Hess told her that Bernard's shirt was the same one that Bernard had been wearing on the night when Dena was murdered. Annette replied, " 'Well, he didn't kill her. I did.' " She said, " 'I was sitting on her chest and my hands felt like magnetic [vices] when they closed around her throat. And I was squeezing until blood came from her nose.' " Detective Hess testified that Annette

> went on to explain about her and her husband planning this thing, so that her husband could have intercourse with Dena Polis. And that on a cue [Annette] was going to pull [Dena] from the front of the van, by the neck, and throw her in the back of the van, where this choking action took place.

The Baltimore City police turned the investigation over to the Maryland State Police. On Monday, April 21, Annette was in the custody of Trooper Michael Joseph Callanan in a jury room at the Harford County Court House awaiting a bond review hearing. Annette told Trooper Callanan that she had killed Dena because she did not want Dena telling people on the streets, or the police, that Bernard had raped Dena. Annette said that Dena was screaming and " 'that's

when I cut her off.' " The last thing which Dena said to Annette was " ' "I have too much to live for." ' "

Annette testified at the guilt or innocence stage of her trial. Her testimony was that the trio had driven into Harford County in order to show Dena a floor tile job there. While Bernard was driving on a side road, he stopped so that Annette could go to the bathroom in the woods. When she returned to the van, she said she found Bernard and Dena having consensual intercourse. The two women argued and Annette's mind went blank. The next thing Annette remembered was that Bernard was pulling her back, while she was choking Dena who was lying in the rear of the van with Annette astride her.

Much the same version of the killing was given by Annette to Lawrence Donner, Ph.D. and to John McI. Henderson, M.D., her expert witnesses in clinical psychology and forensic psychiatry, respectively.

Appellant had, by plea, interposed the defense of insanity, on which threshold hearings were conducted out of the presence of the jury. Neither Dr. Henderson nor Mr. Donner were able to express an opinion that Annette was not responsible for criminal conduct under the test established by Md.Code (1957, 1979 Repl.Vol.), Art. 59, § 25.[1] There was no evidence of insanity so as to raise that defense for jury consideration. However, Dr. Henderson was of the opinion that "at the time of the alleged offense, [Annette] lacked the capacity to form the intent to premeditatively murder." The court ruled that it would "permit Doctors Henderson and Donner to testify [before the jury] as to the Defendant's diminished mental capacity and to explain how this could

---

1. Subsection (a) of that statute in part provides that a
 defendant is not responsible for criminal conduct and shall be found insane at the time of the commission of the alleged crime if, at the time of such conduct as a result of mental disorder, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.
 This section has been recodified at Md.Code (1982), § 12–107 of the Health-General Article.

have influenced her behavior on the date and time of and in the circumstances surrounding the alleged criminal acts," but that "[t]hey [would] not be permitted to render an opinion on the ultimate issue as to whether the Defendant possessed the required specific or general intent to commit the acts alleged.[2]

The jury was instructed on both first and second degree murder. It was also instructed that it could consider diminished capacity as a defense to premeditated, first degree murder and to robbery. The verdict of guilty of murder in the first degree was based upon felony murder.

Sentence was imposed only for murder. A valid finding of guilty on any one of the underlying felonies would support the final judgment of conviction for felony murder from which the appeal has been taken. However, because the verdicts on the felony charges affected the sentence for murder, we shall consider all of the points raised by Annette.

(1)

Appellant's first point is that the trial court erroneously excluded evidence during Dr. Henderson's direct examination before the jury. An understanding of the setting giving rise to the argument requires a review of certain factors at work in the trial.

Between her arrest in April and her trial, which commenced in December of 1980, Annette gave many descriptions of the killing. They ranged from the signed, inculpatory, written statement furnished to the Baltimore City police on April 19 to a version, given orally to a State psychiatrist

---

**2.** In *Johnson v. State*, 292 Md. 405, 419, 439 A.2d 542, 551 (1982) we described the concept of diminished capacity by quoting from Annot., 22 A.L.R.2d 1228, 1238 (1969) as follows:

"[S]ince certain crimes, by definition, require the existence of a specific intent, any evidence relevant to the existence of that intent, including evidence of an abnormal mental condition not constituting legal insanity, is competent for the purpose of [negating] that intent .... [T]he actual purpose of such evidence is to establish, by negating the requisite intent for a higher degree of offense, that in fact a lesser degree of the offense was committed."

while she was being examined at Spring Grove State Hospital, in which Annette claimed that Bernard had held a gun to her head and ordered her to choke Dena. Defense strategy included attempting to elicit from Dr. Henderson a version of the facts which would have constituted second degree murder and which, in Dr. Henderson's opinion, was true.

Additionally, the trial court had ruled that it would permit evidence relating to diminished capacity to form a required criminal intent. This conclusion was reached on January 5, 1981 at the end of the threshold hearings on the aborted insanity plea. The determination was rendered more than one year before this Court held in *Johnson v. State, supra,* 292 Md. 405, 439 A.2d 542 that diminished capacity is not a defense to criminal culpability. Thus, the trial court's ruling was more favorable to the Appellant than Maryland law requires. But, in so ruling, the trial court distinguished between (1) expert testimony describing Annette's diminished capacity and how it might have affected her conduct and (2) an opinion on the ultimate issue that Annette did not have the requisite intent. When the defense experts were testifying before the jury, the ground rules were, as laid down by the trial court, that type (1) testimony would be permitted, but type (2) would not be permitted.

Shortly prior to the evidentiary ruling of which Annette complains, Dr. Henderson had been asked by defense counsel:

Q. Now, can you tell us what you think happened [preceding and during the choking]?

A. Yes.

[THE STATE]: Objection.

There followed a bench conference in which the court stated it would permit Dr. Henderson to talk about how Annette's personality might have influenced her actions, but that it would not permit him to say that what Annette had told the

police was a lie, and that some other version was not a lie "or something like that."

Direct examination proceeded.

Q. Okay. Did there come a point when you believed any particular statement?

A. At no time did I believe any particular one in its entirety. But there was one which was more credible than others. And with a few exceptions, seemed to fit all of the material from the other sources.

Q. Okay. And what was that version?

[THE STATE]: Objection.

THE COURT: Overruled. Go ahead.

The witness said that the version which he "found credible" was fairly close to the first version given by Annette at Spring Grove. From the Spring Grove records he read the note of an interview conducted shortly after Annette's admission for evaluation on July 8, 1980. In this version Annette said the trio had been drinking beer and smoking marijuana. Bernard disrobed himself and announced that he would have sex with his stepniece. Everyone laughed and considered it was a joke. Annette left the van to relieve herself and returned to find Bernard and Dena having sexual relations. Dena asked Bernard "for more." Annette became angry, tried to hit Dena and caught her by the neck instead. Annette started to squeeze harder and harder until she noticed that Dena was not breathing anymore. Annette disclaimed any intent to kill Dena but only to hurt her.

Dr. Henderson then read through other versions appearing in the Spring Grove notes, including the one in which Bernard had a pistol and another in which Bernard left the van when Annette began fighting with Dena.

Defense counsel then asked:

Q. Now, you mentioned that you had a version which was credible, at least in your opinion, and similar to a version that you read to us just now from Spring Grove, is that correct?

Dr. Henderson responded "yes" and again stated that the version which he believed was credible was "not exactly like any version" but not "too different from the first one" at Spring Grove. He said his opinion was based in part on what Bernard had said to an interviewer (whom the witness did not identify). He read from notes of that interview in which Bernard said the sex with Dena was consensual. Still "responding" to the same question, he went on to say that based on Annette's personality profile, as drawn from various psychological testing done, "I do not feel[,] and this is an opinion 'to a reasonable degree of medical certainty[,]' that Annette Stebbing has the emotional capacity to aid, abet, participate...." At that point the witness was interrupted by the State's objection which the court instantly sustained. It is this ruling on which Appellant bases her first argument.

The State then requested a bench conference "to talk to the Doctor about this problem." At the bench, with the witness present and before anyone else spoke, the court said, "You sort of overlooked it, but I had not." The judge then referred to the ruling prohibiting the experts from giving "an opinion on the ultimate issue of whether or not [Annette] had a specific intent or general intent with regard to any of the crimes that are charged against her." Defense counsel argued that Annette "didn't have the emotional capacity *to form the intent.*" (Emphasis added). In the course of the sidebar discussion, the following transpired:

> [DEFENSE COUNSEL]: Let him finish the answer right here. What were you going to say?
>
> [DR. HENDERSON]: I was going to say that [Annette] didn't have the emotional capacity to participate in or aid or abet her husband in having intercourse with any female. And that ... would include Dena Polis.
>
> THE COURT: *Nothing wrong with that.* [Emphasis added.]

The State then argued that rape is a general intent crime, and that even those courts which allow the diminished capacity defense apply it only to specific intent crimes. The

argument on an ultimate opinion of diminished capacity continued until proceedings recessed for the day.

In chambers the next morning defense counsel, armed with citations to decisions approving the diminished capacity defense, argued that Dr. Henderson "should be able to testify as to whether or not Annette had the capacity to deliberately, voluntarily, wilfully and premeditately kill Dena Marie Polis in the context of the situation in which she found herself at the time of the alleged murder." The State argued, *inter alia,* that Dr. Henderson's proposed opinion would not be based on any version of the facts in evidence, but was to be based upon what he determined those facts to be. The court adhered to its prior ruling that the expert would not be permitted to state that Annette "lacked capacity to form an intent." Defense counsel then consulted with Dr. Henderson and returned to chambers with two questions designed to distinguish between an opinion that the defendant did not have the required specific intent and an opinion that the defendant did not have the capacity to form a required specific intent. The court ruled that it had already said it would not permit either type of testimony.

Direct examination of Dr. Henderson continued before the jury through the balance of the morning. Upon resumption of the proceedings following the luncheon recess, defense counsel concluded his examination by putting three questions to Dr. Henderson for the obvious purpose of making a record. Objections were sustained as to each. The questions were whether the witness had an opinion as to Annette's intent, and as to her capacity to form an intent, and whether those opinions were held to a reasonable degree of medical certainty.

■ There was no trial court error in the evidentiary ruling complained of. The State had objected, and the court immediately sustained that objection, because it appeared that Dr. Henderson was about to state an "ultimate issue" opinion of diminished capacity. Defense counsel argued at the time, and the next morning, for the admissibility of an

opinion stating the conclusion that Annette lacked intent because of diminished capacity. Because, under *Johnson, supra,* diminished capacity is not a defense, the trial court could not have erred in rejecting the position taken by Annette's trial counsel.

■ On this appeal, Annette shifts from the pre-*Johnson* ground asserted by her trial counsel and focuses on the balance of the answer which Dr. Henderson gave at the sidebar conference. She now points out that the doctor intended to say that she was emotionally incapable of assisting her husband in having intercourse with another woman. This is admissible, says Annette, because it tends to make more probable her version that the Bernard-Dena intercourse was consensual.

However, the question before us is not the theoretical admissibility of such evidence, but whether the trial court erred. We express no view on whether, conceptually, such evidence may ever be admissible, or whether it is different in kind from an opinion of diminished capacity. What is important on this appeal is that after Dr. Henderson made his proffer, the trial court said there was "[n]othing wrong with that." The trial judge had repeatedly made plain that he would permit expert testimony as to Annette's personality profile and how it might have affected her conduct at the time of the offense. Yet, in the remainder of Dr. Henderson's testimony, he was not asked a question about, nor did he attempt to include in any answer, Annette's emotional incapacity to assist Bernard in sex with another woman. The matter simply did not come up again. This means that Annette's first issue is really a non-issue. It is not in this case.

■ There is a further reason why there was no error. The question put to the witness asked him to confirm that he did have an opinion as to which of Annette's many versions was credible. After replying "yes," which was all the answer that the question called for, the witness went on to give reasons. The testimony that was interrupted, if

responsive at all, was in explanation of how Dr. Henderson was able to arrive at the "credible" version. There were substantial conflicts in material facts between the various versions which Annette had given and which the witness was permitted to read into the record. Dr. Henderson's answer makes plain that his determination of the "credible version" was not based on any single version. Even if there could be a case in which a psychiatric expert might be permitted to express an opinion on credibility of a specific witness, *see, e.g., United States v. Hiss,* 88 F.Supp. 559 (S.D.N.Y.1950), *aff'd,* 185 F.2d 822 (2d Cir.), *cert. denied,* 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951), an expert is not permitted to resolve conflicts in the evidence in order to formulate the basis for his opinion. *See Thompson v. Phosphate Works,* 178 Md. 305, 318–19, 13 A.2d 328, 334–35 (1940).

## (2)

Appellant also complains of the exclusion of opinion evidence from Mr. Donner concerning female sexual response. On redirect, Donner had read into the record a description of the offense which Annette had given to a physician at Spring Grove State Hospital on July 14. In that statement Annette said that, on returning to the van, she found Bernard and Dena engaged in coitus, that Annette became angry, and that Dena asked Bernard "for more." Later in the redirect Donner was asked, on the assumption that Dena had in fact asked Bernard "for more," to state the psychological significance of that statement from the standpoint of its effect on Annette. He said Annette became enraged. Donner was then asked, "[I]f the female is interrupted in the course of intercourse, is there some psychological process that's happening with respect to her arousal or excitement?" An objection was sustained. The witness was then asked to explain "the process that generally . . . the normal female would go on in sexual arousement." Objection was again sustained. It was then proffered that the witness could explain

the whole psychological process that goes on when a female is aroused sexually, and the effect that that would have on Dena during the [—] when the sexual intercourse was interrupted by Annette, and why that statement in Spring Grove would have some validity. In other words, what we are trying to do is show why that statement can be believed.

The judge adhered to his ruling. He assumed that the witness could "tell us what the average woman does ... when interrupted," but considered that the witness would only be speculating about Dena's reaction.

 The test for appellate review of the exclusion of proffered expert testimony was stated for this Court by Judge Levine in *Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069, 1074–75 (1977) where he said:

[T]he admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal. *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472 (1977); *see I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 12–13, 344 A.2d 65 (1975); *Franceschina v. Hope,* 267 Md. 632, 636, 298 A.2d 400 (1973). It is well settled, however, that the trial court's determination is reviewable on appeal, *Radman v. Harold,* 279 Md. at 173 [367 A.2d 472]; *Refrigerating Co. v. Kreiner,* 109 Md. 361, 370, 71 A. 1066 (1909), and may be reversed if founded on an error of law or some serious mistake, or if the trial court has clearly abused its discretion. *Radman v. Harold,* 279 Md. at 173 [367 A.2d 472]; *see Telak v. Maszczenski,* 248 Md. 476, 496–97, 237 A.2d 434 (1968).

The court did not abuse its discretion. A trial judge has discretion to determine whether proffered opinion evidence of questionable relevance will be sufficiently helpful to the jury to justify an excursion into the subject through direct, cross and redirect. Here, a description of the usual response of the average female would not necessarily be helpful to

the jury, many of whom were married.[3] Normal response of the average woman is even less helpful when the jury was considering the response of a female who is said to have been engaged in consensual intercourse in the back of a van with another woman's husband during the relatively brief interval while the wife has stepped into the woods to relieve herself.

### (3)

■ The verdict of guilty of robbery is challenged. Appellant's position is that an intent to steal must exist at the time force is exerted or threatened, and that there was insufficient evidence to support such a finding in this case. The point was raised by a motion for judgment of acquittal at the conclusion of the entire case and was denied. The trial court instructed the jury that "[t]here must be a taking and removal with the intent to permanently deprive the owner of her property," and that "violence must accompany or precede the robbery." This correctly states the Maryland law. *See Midgett v. State,* 216 Md. 26, 43, 139 A.2d 209, 218 (1958). *See also* Clark & Marshall, *A Treatise on the Law of Crimes* § 12.10 at 884 (7th ed. 1967); 4 Wharton's *Criminal Law and Procedure* § 470 at 44 (Torcia 14th ed. 1981).

*Midgett* involved charges of kidnapping and robbing a police officer. The policeman had unexpectedly come upon persons who were waiting in an alley behind a business office to rob the businessman. The would-be robbers got the drop on the officer. When they were unable to remove his revolver from its holster because of a spring lock, the culprits removed the officer's gunbelt to which were attached the holster with the gun, a nightstick and a flashlight. They left the scene by car, taking the officer and the gunbelt with them. The gun was later freed from the holster and was eventually hidden by the defendant. We

---

**3.** This fact appears in the record when the trial judge allowed Mr. Donner to testify concerning the mechanics and techniques of anal intercourse, a subject not necessarily within the jurors' experience.

held the evidence was sufficient to support a conviction for robbery and said that "subsequent appropriation is a circumstance to be considered, along with all other relevant facts, in determining the existence of an intent to steal at the time of the initial taking." 216 Md. at 42, 139 A.2d at 217. *See also Halcomb v. State,* 6 Md.App. 32, 39, 250 A.2d 119, 122–23 (1969).

In the instant matter, it was appropriately a jury question whether appellant had an *animus furandi* at the time of the taking and asportation of Dena's belongings. A blue sapphire ring which Dena was wearing when she entered the van at her home on the day of her death was found, during a search by the police on April 25, 1980, in a ceramic candleholder on a shelf in the closet at Bernard's and Annette's living quarters. Annette denied knowledge of the ring. However, the uncontradicted evidence showed that Bernard and Annette acted jointly in disposing of Dena's other belongings. If Bernard acted alone in taking and hiding the ring, it is highly unlikely that he would have placed it in the closet at their mutual, one-room abode. Further, on the evening of Friday, April 11, the day on which Dena's body was found, Annette asked Dena's brother's girlfriend " 'Well, do you know if Dena had her ring on her; if they [the police] found it?' " In view of the other evidence that Annette feigned innocence in the presence of Dena's family, the jury could have concluded that Annette knew the ring was not on the body.

■ Likewise, jointly discarding portions of Dena's clothing supports a finding that it was taken and carried away with the intent permanently to deprive the owner of its possession. The felonious intent element of robbery is not limited to an intent to acquire benefit of a pecuniary nature for oneself. *See Canton Bank v. American Bonding Co.,* 111 Md. 41, 45, 73 A. 684, 685 (1909).

Appellant essentially asks us to rule as a matter of law that, unless the intent to steal coincides with the use of violence, the crime is not robbery. This argument assumes

that Annette's intent when she assaulted Dena was solely to assist Bernard's rape and sodomizing of Dena and not to rob her. However, Dena's jeans and panties, and inferentially the boots which she was wearing, were pulled from her body when the attack commenced, and the force separated her from control over her purse. From the subsequent discarding of those items, the jury could have inferred that the intent permanently to deprive Dena of their possession coincided with the use of force. The intent to rape and the intent to steal are not mutually exclusive. *See State v. Welchel,* 207 Neb. 337, 343, 299 N.W.2d 155, 159 (1980). *See also Commonwealth v. Stelma,* 327 Pa. 317, 192 A. 906 (1937) (jury could disregard defendant's version that victim was subdued in a drunken brawl after which defendant took victim's money and conclude that victim was assaulted with intent to steal, based on the taking).

█ Even if the evidence in the instant case compelled the conclusion that Annette's intent in subduing and choking Dena was only to assist in rape and sodomy, and that the intent to steal was not formed until after the force had resulted in Dena's death, the taking and asportation of Dena's belongings would still be robbery. This is the majority rule and we shall follow it.

W. LaFave & A. Scott, *Criminal Law* § 94 at 701–02 (1972) presents the following analysis:

The defendant's acts of violence or intimidation must occur either *before* the taking (though continuing to have an operative effect until the time of the taking) or *at* the time of the taking. Concerning the required concurrence of the defendant's conduct and state of mind, there is a question as to the robbery liability of one who strikes another, perhaps intentionally but with no intent to steal (or who intimidates another, though without an intent to steal), and who then, seeing his adversary helpless, takes the latter's property from his person or his presence. In other words, does robbery require that the defendant's violence-or-intimidation acts be done for the very purpose

of taking the victim's property, or is it enough that he takes advantage of a situation which he created for some other purpose? The great weight of authority favors the latter view, holding that under the circumstances it is robbery; but it can be argued that on principle it ought not to be robbery, being only larceny (plus, if the circumstances warrant it, assault or battery or whatever other crime the defendant may have committed before his theft). [Emphasis in original (footnotes omitted).]

2 East, *Pleas of the Crown* (1806) states that one who applies force to another, or puts another in fear, commits robbery "although the thing taken were not really within the original contemplation of the robber, nor the object of his pursuit at the time." East describes the case of *Rex v. Blackham,* tried in 1787 (*id.* at 711–12):

Blackham assaulted a woman with intent to commit a rape, and she without any demand from him offered him money, which the prisoner took and put into his pocket, but continued to treat her with violence to effect his original purpose, till he was interrupted by the approach of another person. This was holden to be robbery by a considerable majority of the Judges: for the woman, from violence and terror occasioned by the prisoner's behaviour, and to redeem her chastity, offered the money, which it was clear she would not have given voluntarily; and the prisoner, by taking it, derived that advantage to himself from his felonious conduct; though his original intent were to commit a rape.

Of like effect is *Rex v. Hawkins,* 3 Carr. & P. 392 (1828). There a gamekeeper came upon a group of poachers. They beat the gamekeeper until he was unconscious, left him lying on the ground and fled. After the poachers had gone some little distance, one of them, Williams, returned and took the gamekeeper's money and gun. Judgment was that the poachers, other than Williams, were not guilty of robbery. It was said that only Williams, who was not apprehended, had committed robbery.

In a case in which the money of the victim was taken in the course of a sexual attack, the Supreme Court of Hawaii has approved the following instruction, granted at the request of the prosecution:

"The law does not require that the use of force or the threatened imminent use of force be done for the very purpose of taking the victim's property. If you find that the defendant, while armed ... threatened the imminent use of force for the purpose of sexual intercourse or deviate sexual intercourse, and that he later formed the design to take the property, you may find that he threatened the imminent use of force with intent to compel acquiescence to the taking of the property." [*State v. Iaukea,* 56 Haw. 343, 356, 537 P.2d 724, 733 (1975).]

To the same general effect are: *People v. McGrath,* 62 Cal.App.3d 82, 133 Cal.Rptr. 27 (1976) (victim murdered in retribution for homosexual attack on third party; defendant then removed money from victim's pockets);[4] *People v. Jordan,* 303 Ill. 316, 135 N.E. 729 (1922) (victim knocked out in street fight; then victim's money taken); *People v. Pavic,* 104 Ill.App.3d 436, 60 Ill.Dec. 175, 432 N.E.2d 1074 (1982) (force used in rape of victim remained in effect when money taken from victim's purse nearby); *State v. Myers,* 230 Kan. 697, 640 P.2d 1245 (1982) (manslaughter slaying of victim during argument; three hours later defendant returned to scene and took wallet and money from the victim's body); *Howard v. Commonwealth,* 313 Ky. 667, 233 S.W.2d 282 (1950) (attempted rape of victim in her home; defendant takes victim's purse when leaving); *State v. Covington,* 169 La. 939, 126 So. 431 (1930) (intent to rob need not be present during beating of victim whose money was taken after he appeared to be dead); *Crenshaw v. State,* 13 Md.App. 361,

---

4. The defendant in *McGrath* was charged with robbery. The jury was instructed on the lesser included offense of "grand theft person" and actually convicted on the lesser offense. However, the court stated that "[i]t is sufficient for purposes of robbery or grand theft from the person that the murder and taking be part of one continuous transaction." 62 Cal.App.3d at 86, 133 Cal.Rptr. at 29.

373, 283 A.2d 423, 430 (1971), *cert. denied,* 264 Md. 746 (1972) (threatened harm to victim's children compelled her submission to defendant's sexual attack in victim's home; "[t]he same force and coercion was present in the robbery," involving money taken by defendant when leaving premises); *Hope v. People,* 83 N.Y. 418 (1881) (victim forced to reveal combination to safe located on bank premises; key to bank taken from table in victim's bedroom when defendants leaving); *State v. Nathan,* 39 S.C.L. 219 (5 Rich) (1851) (assault with intent to rape; victim pays money to dissuade attacker); *Turner v. State,* 150 Tex.Cr.R. 90, 198 S.W.2d 890 (1947) (victim knocked unconscious in altercation arising out of minor traffic accident; then money taken); *Alaniz v. State,* 147 Tex.Cr.R. 1, 177 S.W.2d 965 (1944) (victim beaten to avenge insult, then money taken). *Contra People v. Green,* 27 Cal.3d 1, 609 P.2d 468, 164 Cal.Rptr. 1 (1980) (minority rule adopted but not applied); *People v. King,* 67 Ill.App.3d 754, 24 Ill.Dec. 146, 384 N.E.2d 1013 (1979); *People v. Pack,* 34 Ill.App.3d 894, 341 N.E.2d 4 (1976); *United States v. Birueda,* 4 Phil. 229 (1905); *Branch v. Commonwealth,* 225 Va. 91, 300 S.E.2d 758 (1983).

 The instant case makes explicit what was implicit in *Midgett, supra,* namely that there must be an intent to steal at the time of the taking. If the force precedes the taking, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after death is nevertheless robbery. *See Foster v. State,* 297 Md. 191, 464 A.2d 986 (1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 985, 79 L.Ed.2d 221 (1984).

(4)

 An attack is also directed at the finding of guilty of first degree sexual offense. Defense counsel had sought a judgment of acquittal by asserting a lack of evidence that the victim was alive at the time of the anal intercourse. There was sufficient evidence. In her written statement

Annette said that Bernard had told her to turn the victim over because he wanted to have anal intercourse. She said, "I [lifted] up and turned her over, with Lee's help and I was still strangling her around the neck." After the victim was turned over, Bernard engaged in anal intercourse. In that same statement Annette said that she strangled the victim "until there was no life in her." In an oral statement to Detective Hess, which preceded Annette's signed statement, Annette also described turning the victim over at Bernard's request, sitting on the victim's back, and "still choking her" when Annette saw blood coming out of the victim's mouth and nose. Under this evidence, the jury could conclude that Appellant aided and abetted a first degree sexual offense while the victim was still alive.

Appellant alternatively argues that Dena was unconscious at the time of anal penetration so that, as a matter of statutory construction, the crime is a second degree sexual offense. That grade of the offense will lie, *inter alia,* when the victim is "physically helpless." Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 464A(a)(2). The definition of "physically helpless" includes "a victim who is unconscious . . . ." § 461(d)(1). In this case, strangulation was a major part of the force which overcame the resistance and the will of the victim, which made possible the rape and the anal intercourse, and which caused the unconsciousness and ultimate death. Where strangulation is inflicted and the other elements are present, the crime is first degree sexual offense.[5] Annette aided and abetted that offense and is a principal in the second degree to its commission.

---

5. Art. 27, § 464, "First degree sexual offense," in relevant part provides:

(a) *What constitutes.*—A person is guilty of a sexual offense in the first degree if the person engages in a sexual act:

(1) With another person by force or threat of force against the will and without the consent of the other person; and

. . . .

(ii) Inflicts suffocation, strangulation, disfigurement, or serious physical injury upon the other person or upon anyone else in the course of committing the offense . . . .

## The Sentence

Appellant's remaining contentions are aimed at the death sentence imposed by the trial judge. He found one aggravating factor, one mitigating factor, and that the latter did not outweigh the former. Commission of the murder while committing robbery, rape or sexual offense in the first degree was the aggravating factor, while the absence of any previous conviction for a crime of violence was the mitigating factor.

The jury based its verdict of guilty of first degree murder exclusively on felony murder. Consequently, the trial court imposed sentence only on the first degree murder conviction and not on any of the underlying felony guilty verdicts. *See State v. Frye,* 283 Md. 709, 724, 393 A.2d 1372, 1379–80 (1978); *Newton v. State,* 280 Md. 260, 373 A.2d 262 (1977).

### (5)

■ Annette contends that where the homicide is first degree murder solely because of the felony murder rule, none of the underlying felonies may be used as aggravating factors in the capital sentencing phase. In support, she cites *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980), a case involving a death sentence for felony murder. North Carolina's capital sentencing statute, like that of Maryland, does not include first degree murder committed with premeditation and deliberation as an aggravating circumstance. *Cherry* held:

> We are of the opinion that, nothing else appearing, the possibility that a defendant convicted of a felony murder will be sentenced to death is disproportionately higher than the possibility that a defendant convicted of a premeditated killing will be sentenced to death due to the "automatic" aggravating circumstance dealing with the underlying felony. To obviate this flaw in the statute, we hold that when a defendant is convicted of first degree murder under the felony murder rule, the trial judge shall not submit to the jury at the sentencing phase of the trial

the aggravating circumstance concerning the underlying felony. [*Id.* at 113, 257 S.E.2d at 568.]

A somewhat similar rule has been adopted by the Court of Criminal Appeals of Alabama. See *Bufford v. State,* 382 So.2d 1162 (1980).

The *Cherry* court recognized that it was not confronted with a double jeopardy problem, 298 N.C. at 113, 257 S.E.2d at 567. The holding in *Cherry* seems to be premised either on an interpretation of the North Carolina capital sentencing statute, see *State v. Goodman,* 298 N.C. 1, 24, 257 S.E.2d 569, 584 (1979) or on a North Carolina rule of merger, see *State v. Silhan,* 302 N.C. 223, 262, 275 S.E.2d 450, 478 (1981). While Annette does not argue that the *Cherry* rule is of constitutional dimension, she suggests that the United States Supreme Court's decision in *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) brings the double duty use of the underlying felonies, as seen by *Cherry,* within the prohibition of using a single offense to justify two separate punishments. *Bullington,* however, only addressed what the State may or may not do at the sentencing proceeding at a second trial. That decision has no application to the *initial* sentencing hearing. *See Wheat v. State,* 420 So.2d 229, 239–40 (Miss.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1507, 75 L.Ed.2d 936 (1983); *State v. Pinch,* 306 N.C. 1, 31, 292 S.E.2d 203, 225–26 (1982).[6]

Maryland's capital punishment statute, Art. 27, §§ 412–414 makes plain the legislative intent that the commission of certain felonies, underlying a felony murder conviction, is to be considered an aggravating circumstance in the capital sentencing proceeding. At least 30 days prior to trial, the

---

**6.** In *Gregg v. Georgia,* 428 U.S. 153, 193 n. 44, 96 S.Ct. 2909, 2935 n. 44, 49 L.Ed.2d 859, 886 n. 44 (1976), the opinion announcing judgment refers with approval to ALI, Model Penal Code § 210.6 (Proposed Official Draft 1962) which in subsection (3)(e) includes as an aggravating circumstance the fact that the murder was committed while the defendant was engaged in committing "robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping."

State must notify the accused of its intent to seek a sentence of death and must advise the accused "of each aggravating circumstance" upon which it intends to rely. § 412(b). Section 413(c)(1) provides that the "following type of evidence is admissible in [a sentencing] proceeding:

. . . .

(ii) Evidence relating to any aggravating circumstance listed in subsection (d) of which the State had notified the defendant pursuant to § 412(b)."

Section 413(d) lists the aggravating circumstances, of which the tenth is that the "defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree." Appellant's argument ignores the plain language of the statute.

Nor is any merger problem presented. While the underlying felony convictions in the instant matter merged into the felony murder conviction, there was but one sentence imposed. That the murder in the instant case occurred in the commission of § 413(d)(10) felonies is a fact, and that fact does not disappear or lose legal significance simply because Appellant was convicted of felony murder. The fact may be considered, as § 413 expressly directs, in determining whether the sentence should be death rather than life imprisonment.

In *Whack v. State,* 288 Md. 137, 149, 416 A.2d 265, 271 (1980), *appeal dismissed* and *cert. denied,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981), we said quoting from *Newton v. State, supra,* 280 Md. at 274 n. 4, 373 A.2d at 269 n. 4:

"[T]he legislature may indicate an express intent to punish certain conduct more severely if particular aggravating circumstances are present by imposing punishment under two separate statutory offenses which otherwise would be deemed the same under the required evidence test . . . ."

*A fortiori* there is no error here where we are concerned only with the sentence for one crime, the felony murder.[7]

(6)

Appellant next argues that the trial court erred by failing to find three statutory mitigating factors, namely:

1. "The youthful age of the defendant at the time of the crime" (§ 413(g)(5));

2. "The murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, [or] emotional disturbance" (§ 413(g)(4)); and

3. "It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society" (§ 413(g)(7)).

It is the accused's burden to prove, by a preponderance of the evidence, the existence of a mitigating circumstance. § 413(g); *Tichnell v. State,* 287 Md. 695, 730, 415 A.2d 830, 848–49 (1980). Here the Appellant claims that the trial court was legally required to have found the above-enumerated factors, *i.e.,* we are asked to review the absence of certain findings. In *Tichnell,* one of the issues on appeal was the sufficiency of the evidence to support, beyond a reasonable doubt, the conviction of premeditated first degree murder. There we applied the standard laid down in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) of " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Id.* at 319 [99 S.Ct. at 2789] (emphasis in original)." 287 Md. at 717, 415 A.2d at

---

**7.** *State v. Cherry* was specifically argued to, and rejected by, the Supreme Court of Tennessee in *State v. Pritchett,* 621 S.W.2d 127 (1981). That court considered that *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) had implicitedly approved application of the felony of robbery, committed as part of the act of murder, as a valid aggravating circumstance to support the imposition of the death penalty. 621 S.W.2d at 141.

842. It follows that, in a case like that at hand, the standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational sentencing authority could have concluded that the accused failed to prove the claimed mitigating circumstance by a preponderance of the evidence.

Analysis of Appellant's contentions under this standard requires a review of Annette's background. This was a major part of the seven trial day presentation by the defense to the jury. Among the defense witnesses were Annette's parents, counselors, teachers, and employers, as well as psychological and psychiatric experts.

Annette was born on December 16, 1960 and was 19 years and 3 months old when she murdered Dena Polis. Appellant is the fourth of five children. Her mother frankly states that the pregnancy with Annette was unwanted. When Appellant was almost six years old, her mother sensed that something was wrong with Annette in relation to the other children and had her evaluated at Johns Hopkins Hospital. Based on that evaluation, Annette was placed in special education classes in the Baltimore County school system. She completed the ninth grade.

Annette dropped out of school at age 16 in the tenth grade. Over the next two years, she ran away from home on an estimated ten occasions. Juvenile proceedings, apparently arising out of runaway incidents, were initiated on February 23 and May 4, 1977. On April 30, 1977, during a runaway incident, Annette and two other girls were arrested in a vacant motel on Route 40 and charged as juveniles with breaking and entering. After the two earlier charges were disposed of on June 3, 1977, by Annette's release to her parents, she ran away again and for about two months lived with a young man. She returned home about August 1 and accompanied her family on a three week vacation in Wisconsin.

As a result of the arrest on breaking and entering charges, a juvenile counselor in the Department of Juvenile

Services arranged for a psychiatric examination. That report, based on history, submitted the impression

> that this girl might be mildly mentally retarded. It seems also from the results of the mental status that she might be borderline case and there is a possibility that under stress and if untreated she could wander, perhaps for a short time, into psychosis.

The psychiatrist recommended a new battery of psychologicals "to clarify some of the dynamics and to secure a new IQ." He also recommended probation with commitment for a brief period to Montrose for any violation, provided "mental condition doesn't contraindicate it . . . ."

The psychological evaluation, dated May 11, 1977, reported in part:

> The results of the WISC–R [Wechsler Intelligence Scale for Children] place Annette in the mentally defective range of intellectual functioning but this score is not valid because of the difference of twenty eight points between her Verbal and Performance IQ scores. Her Performance IQ probably reflects her basic potential which lies in the dull-normal to average range. . . . Her overall pattern is suggestive of a child who is learning and language disabled.

This psychologist recommended that Annette receive vocational training and that family counseling continue.

On September 9, 1977 the Baltimore County Juvenile Court placed Annette on supervised probation on the breaking and entering charge, and she was released to her parents. Her Juvenile Services counselor referred her to a vocational counselor in the Division of Vocational Rehabilitation (DVR). A vocational evaluation and a "Beta" psychological were done at that time. The Beta indicated a score of 95. Based on that evaluation the rehabilitation plan developed for Annette proposed that she acquire a general equivalency high school diploma (GED) at Harford Community College and at the same time train for a vocation.

Annette commenced a Youth Employment Training Act program at Harford Community College in January 1978. In the morning she attended small group classes in reading and arithmetic. In the afternoon she worked in clerical positions on the campus. Her reading comprehension remained at the fourth to fifth grade level. DVR had a follow-up psychological test performed in July of 1978. It is described in a section of the report from the DVR vocational counselor to Annette's counselor at the training program.

Annette is a girl who has a very poor self-concept who experiences threat from the world. She is suffering from depression and she and her parents have agreed to begin counseling at the Children's Aid and Family Service Society. Annette is a person who needs a great deal of support and it appears that it will be difficult for her to be successful in training and employment. On the WAIS she received a Verbal I.Q. of 73, Performance of 85, and a Full Scale of 77 placing her in the "mildly retarded" range of intellectual functioning. While these results are quite different from those of the evaluation in 1977, there is no apparent reason to explain it. It seems doubtful that Annette will be able to achieve a GED. Her clerical skills are in the average range in terms of visual-associative learning. Her mechanical abilities fall in the high "bright-normal" range. There is no evidence of generalized organic impairment.

Testifying at the murder trial, the vocational counselor said Annette had average clerical ability and that, with the proper motivation and training, she could have become employed as a clerical worker in office surroundings.

In August of 1978, Annette again ran away from home and never returned to the GED-vocational training program. She was employed in 1978 for approximately two months as a security guard but was dismissed for missing a station on her rounds.

On April 26, 1979, while still on probation on the juvenile charges, Annette was arrested for larceny of a rifle and ammunition from one James Behrens. Annette was living

with Behrens at the time. She explained the incident as retaliation for Behrens' having pointed the rifle at her when they were quarreling. Annette was charged on May 30, 1979 under the Motor Vehicle Code with the offense of "fleeing or eluding police."[8] Disposition of these two charges, following trial, was held *sub curia* in July.

In June 1979, while still on juvenile probation, Annette was arrested and convicted for possession of marijuana. She was placed on 12 months supervised probation. The next month she was arrested and convicted for breaking and entering. Annette describes this incident as a pot party in a vacant unit at a garden apartment complex. She was placed on six months supervised probation.

Annette's marriage to Bernard Lee Stebbing took place August 24, 1979. For her work as his helper in tile laying Bernard paid Annette $200 per week.

After Annette had been arrested under a bench warrant issued in the unconcluded larceny case, she was sentenced on November 29, 1979 to 18 months on that charge and to 60 days, concurrent, on the fleeing or eluding conviction. Annette had served 20 days at the Reformatory for Women

---

8. Md.Code (1977), § 21–904 of the Transportation Article provides:
Fleeing or eluding police.
 (a) *Scope of section.*—This section applies when a police officer gives a signal to stop, whether by hand, voice, emergency light, or siren, if:
 (1) The police officer is in uniform, prominently displaying his badge or other insignia of office; and
 (2) The police officer, when in a vehicle, is in a vehicle appropriately marked as an official police vehicle.
 (b) *Driver to obey signal.*—If given a visual or audible signal by a police officer to stop his vehicle, the driver of a vehicle may not attempt to elude the police officer, whether:
 (1) By willfully failing to stop his vehicle;
 (2) By fleeing on foot; or
 (3) Otherwise, by any other means.
Violation of § 21–904 is punishable, for a first offense, by a fine of not more than $1,000 or imprisonment for not more than one year, or both. *See* § 27–101(i)(1).
Fleeing or attempting to elude a police officer was (and is) a 12 point violation, for which Annette's driver's license was revoked. *See* §§ 16–402(a)(23) and 16–404(a)(3)(ii).

when the court modified the sentences to 36 months supervised probation. The special conditions of probation were based upon an evaluation of December 26, 1979 made by the Baltimore County Treatment Alternatives to Street Crime (TASC). Annette was viewed "as a polydrug abuser who habitually depends on cocaine and alcohol for a high." She was also assessed as immature and impressionable. A schedule of five meetings per week was stipulated. Annette missed many of the meetings, and in February 1980, a warrant for violation of probation was issued. The warrant was outstanding at the time of Annette's arrest for murder.

In a confidential psychological report of September 25, 1980, prepared for the defense of the murder charge, Mr. Donner stated in part that Annette "seemed subtly manipulative" and gave him "the impression that she was not as dumb or silly as she seemed to behave." He also reported:

On the WAIS Annette receives a Full Scale I.Q. of 83 (Verbal I.Q. = 80, Performance I.Q. = 89) which falls into the lower part of the "Dull Normal" range of intellectual functioning with regard to the general population. This score, however, should be considered a conservative reflection of Mrs. Stebbing's current functioning in that the examiner felt that her motivation was only marginal and that she was not doing the best she could on different subtests. On the basis of subtests scatter it is the examiner's opinion that Annette had "average" intellectual abilities with an estimated potential of approximately 101.

His diagnostic impression was "Personality Trait Disturbance (Borderline Personality) with Alcohol Abuse and Neurological Deficit manifested by a Learning Disorder."

At trial Mr. Donner indicated that his diagnosis of borderline personality was based on the inappropriateness of Annette's responses to her environment in terms of her feelings and moods. Donner also testified that he was "wrong" in the impression reported on September 25, 1980 that Annette had average intellectual abilities. The reported statement was made before he reviewed Annette's earlier testing. At trial his opinion was that Annette was doing the best that

she could do on the testing administered by Donner. This had placed her in the "dull-normal" range of intellectual functioning.

Dr. Henderson submitted a report of November 24, 1980 which was received in evidence in the sentencing phase of the murder trial. In that report he said that "[a]ll of [the] data taken together lead toward a diagnosis of Borderline Personality Disorder with mild mental retardation." On cross-examination Dr. Henderson agreed that mild mental retardation would mean an IQ of somewhere between 50 and 70 and that it had been his "mistake" in using "mild mental retardation" as a descriptive term. He said the proper term was "borderline intellectual functioning," which, he added, was not a mental disorder. Dr. Henderson's final position at trial was that "it's probably much better to call it a developmental disorder, learning disability or what have you."

Annette told the probation agent who prepared the presentence investigation in the instant case that she had been smoking marijuana from age 15 and used it almost daily. She said she began snorting cocaine at age 16 and used it about twice a week until her arrest. She also acknowledged drinking heavily following her marriage (half pint to a pint of whiskey daily at the heaviest).

Returning to Appellant's arguments, it is clear that the mitigating circumstance of youthful age is not measured solely by chronological age. Had the General Assembly meant to establish an age at or below which the death penalty could not be imposed, it could have so specified.[9]

---

9. The present capital punishment statute, Art. 27, §§ 412–414, was enacted by Ch. 3 of the Acts of 1978 (Senate Bill No. 374). On February 10, 1978, an amendment was offered from the floor of the Senate to insert in the bill that

No person convicted of the crime of first degree murder who at the time of the commission of that crime was under 18 years of age shall be sentenced to death.

The amendment was defeated.

That same date the Senate also defeated an amendment which would have defined "youthful age" to mean any person 25 years of age or younger. 1 *Maryland Senate Journal* 984–85 (1978).

*Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) makes much the same point. It involved a 16 year old who had murdered a policeman. The Court said (*id.* at 115–116, 102 S.Ct. at 876–77, 71 L.Ed.2d at 11–12):

> But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults. [Citation and footnotes omitted.]

A death sentence imposed on a male 19 years and 7 months of age for a murder committed in the perpetration of a robbery was affirmed in *Neal v. State,* 261 Ark. 336, 548 S.W.2d 135 *cert. denied,* 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh'g denied,* 434 U.S. 961, 98 S.Ct. 495, 54 L.Ed.2d 322 (1977). That court said that "youth," in its ordinary meaning, "is equated with juvenility and adolescence; it seems to reach its outer limits at maturity." Based on the fact that the defendant was old enough to vote, to make a valid will, and to be precluded from rescinding a contract without making restitution, it was held that the sentencing authority "could be justified in finding that Neal had passed the state of adolescence and juvenility." *Id.* at 344–45, 548 S.W.2d at 139.

■ In Maryland, the age of majority is 18. Annette had passed this benchmark a little more than 15 months before the murder. Through repeatedly running away from home, she had been managing her own survival for much of the time since she was 16. She had lived with at least one young man prior to her marriage and had been married for more than seven months at the time she killed Dena Polis. To the trial judge, Appellant's demeanor on the witness stand was "that of a hardened street-wise individual."

There was no error in failing to find youthful age as a mitigating circumstance.

■ In her brief Appellant argues with greater zeal than accuracy that "the evidence of mental impairment was extensive and uncontradicted." There was evidence from which the sentencer could have found that Annette is of average intellectual capability, and that her learning deficiencies are motivational. There was evidence that she was evaluated as having the potential to obtain the equivalent of a high school diploma. There was also evidence that she was of normal, but dull, intelligence. From the standpoint of a required finding of a mitigating circumstance, the following excerpt from the cross-examination of Annette's remedial reading teacher sums up this mitigation issue.

[STATE'S ATTORNEY]: Just because somebody doesn't function very articulately in reading or math doesn't necessarily mean that they can't function within the community at an acceptable standard, is that correct?

[THE WITNESS]: True.

[STATE'S ATTORNEY]: And as a matter of fact, I think we could say generally that other people in Annette's category with this maybe reading level and math level don't necessarily commit crime.

[THE WITNESS]: True.

[STATE'S ATTORNEY]: Thank you, ma'am.

■ The trial court, while finding as a mitigating circumstance that Annette had no prior conviction for a crime of violence, did not find that it was unlikely that Annette would engage in further criminal activity that would constitute a continuing threat to society. The record shows that Annette has been under supervised probation from one court or another since she was 16 years old. The convictions for larceny, fleeing or eluding, possession of marijuana, and breaking and entering at the apartment and at the motel were all offenses committed while she was on probation for one or more prior offenses. Dena Polis was murdered after Annette had experienced confinement at the Women's Re-

formatory, and while a warrant was outstanding against her for violation of probation.

The violence and duration of Annette's attack on the murder victim could also appropriately be considered by the sentencer. Although Annette testified at the sentencing stage that she would never again do anything which would result in her being confined in jail, the sentencing report states that her "credibility was highly suspect," and that her "expression of remorse was not convincing." A rational sentencing authority was not required to find the unlikelihood of engaging in further criminal activity that would constitute a continuing threat to society.

### (7)

An issue of statutory interpretation is presented involving § 413(e) which provides:

> As used in this section, the following terms have the meanings indicated unless a contrary meaning is clearly intended from the context in which the term appears:
>
> (1) The terms *"defendant"* and *"person,"* except as those terms appear in subsection (d)(7), include only a principal in the first degree. [Italics in original.[10]]

The aggravating circumstance found to exist in the instant matter is that "[t]he defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree." § 413(d)(10).

■ Appellant's convictions for first degree rape and sexual offense was as a principal in the second degree for having aided and abetted Bernard. Because "defendant" as used in § 413(d)(10) includes, by definition, only a principal in the first degree, Annette argues that the trial court erred in finding the § 413(d)(10) aggravating factor. In other words, Appellant's position is that not only the murder, but

---

**10.** Section 413(d)(7) is an aggravating factor, namely,

> The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

also the underlying robbery, arson, or rape or sexual offense in the first degree must be committed by the defendant as a principal in the first degree. We reject this contention for a number of reasons.

The special definition of subsection (e)(1) is for the terms "defendant" and "person." It is not a special definition for the terms "committed" or "committing." The "person" with whom § 413 is concerned is a person who has been "found guilty of murder in the first degree . . . ." § 413(a). Not every person who has been found guilty of murder in the first degree is eligible for the capital sentencing procedure under § 413. Only the person or defendant who is guilty of murder in the first degree as a principal in the first degree is eligible. Thus § 413(d)(10) means the "defendant [is a person who has been found guilty of murder as a principal in the first degree and who] committed the murder while committing or attempting to commit robbery [etc.]."

This reading is confirmed by the legislative history. Section 413 was enacted by Chapter 3 of the Acts of 1978. As introduced (Senate Bill 374), the bill included as the third mitigating circumstance that the "defendant was an accomplice in the murder which was committed by another person and his participation was relatively minor." *Laws of Maryland* at 10 (1978). In that form the bill was subject to the interpretation that one who had not actually done the killing, but who was guilty of murder in the first degree, was subject to a sentence of death.[11] By amendments adopted as a package on February 9, 1978, the proposed third mitigating circumstance was deleted, and the definitions now found in subsection (e)(1) were inserted. 1 *Maryland Senate Journal, supra,* at 959–60 (1978). The intent of the definition was clearly to limit eligibility for the death sentence to persons convicted of first degree murder as principals in the first degree and not additionally to require that any under-

---

11. *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, which sets Eighth Amendment limitations on capital punishment for accomplices to felony murder, was decided July 2, 1982.

lying felony, which aggravated the murder to a potential capital offense, also have been committed by the murderer as a principal in the first degree.

Further, the aggravating factor under consideration is that the murder was committed while either "committing or attempting to commit" one of the felonies enumerated in § 413(d)(10). Both the consummated felony and the attempt to commit that felony are treated equally from the standpoint of aggravation. Criminal attempt is a common law misdemeanor in Maryland. *See Lightfoot v. State*, 278 Md. 231, 237 n. 4, 360 A.2d 426, 429 n. 4 (1976); *Walker v. State*, 53 Md.App. 171, 185–86, 452 A.2d 1234, 1242 (1982), *cert. denied*, 296 Md. 63 (1983); *Gray v. State*, 43 Md.App. 238, 239, 403 A.2d 853, 854–55, *cert. denied*, 286 Md. 747 (1979). "The doctrine concerning principals in the first and second degree has no application to offenses that are misdemeanors inasmuch as all parties to a misdemeanor are principals, irrespective of their degree of participation in the offense." R. Gilbert and C. Moylan, Jr., *Maryland Criminal Law: Practice and Procedure*, § 21.2 at 228–29 (1983). *See also Novak v. State*, 214 Md. 472, 478, 136 A.2d 256, 259 (1957); *Handy and Bucci v. State*, 23 Md.App. 239, 250–51, 326 A.2d 189, 195–96 (1974); R. Perkins, *Criminal Law* 655 (2d ed. 1969) ("Nor are the parties to [treason or misdemeanors] distinguished as principals in the first degree or second degree."); W. LaFave & A. Scott, *Criminal Law* 496 (1972); Hochheimer, *Crimes and Criminal Procedure*, § 21 at 38 (2d ed. 1904). Inasmuch as the General Assembly, for purposes of § 413(d)(10), has treated in the same manner both the consummated felony and the misdemeanor of attempting to commit that felony, when the law of degrees of principals has no application to the latter, it appears that the Legislature was not concerned with the distinction between degrees of principals in relation to the § 413(d)(10) crimes which aggravate murder to capital murder.

Finally, Appellant's argument cannot be accommodated in application with the statutory treatment of both certain consummated felonies and of attempts to commit those

felonies as circumstances of equal aggravation. It creates a disparity that the General Assembly could not have intended, as may be shown by a hypothetical. Assume that X and Y are robbing a convenience store. X remains outside in the getaway car, and Y enters the store to effect the robbery. A customer, who is about to enter the store after Y is inside, is shot and killed by X. If Y is frightened by the shooting and flees the store without ever having taken any loot, there is no consummated robbery. Under that hypothesis, X and Y have attempted robbery, and X is eligible for the death penalty. If, however, Y takes some loot, Y is a principal in the first degree to robbery, while X is a principal in the second degree to the robbery. Under Appellant's argument, X, a principal in the first degree to first degree murder, would not be subject to capital punishment, although the total circumstances include a consummated robbery, a more serious crime than attempted robbery.

We hold that the requirement of being a principal in the first degree, as embraced in the definition of "defendant" and "person," relates to the murder which is the subject of the sentencing proceeding and not to the aggravating crimes listed in § 413(d)(10).

(8)

Two arguments which we have previously considered and rejected are also raised by Appellant. She asserts that (1) Maryland's capital punishment statute unconstitutionally places the burden of proof to show mitigation on the accused, and (2) the imposition of the death penalty violates Articles 16 and 25 of the Maryland Declaration of Rights. Both arguments were thoroughly considered and rejected in *Tichnell v. State,* 287 Md. 695, 720–34, 415 A.2d 830, 843–50 (1980). In *Johnson v. State, supra,* 292 Md. at 436, 439 A.2d at 560, we deemed the matter to be settled.

(9)

We have made the review mandated by § 414(e) and have determined that:

1. the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor;

2. the evidence supports the trial court's finding of a statutory aggravating circumstance; and

3. the evidence supports the trial court's finding that the aggravating circumstance is not outweighed by the mitigating circumstance.

There remains to be determined "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." § 414(e)(4).

The legislatively intended inventory of cases from which "similar cases" are to be culled are those first degree murder cases in which the State sought the death penalty under § 413, whether it was imposed or not. *Tichnell v. State*, 297 Md. 432, 464, 468 A.2d 1, 17 (1983). In one sense the instant matter is unique within that inventory because there is no other case in which a female murdered a female victim while directly assisting in the rape and sodomizing of the victim. Nevertheless, comparison can be made to those cases in which the principal aggravating factor was rape or sex offense in the first degree or was the attempt to commit either of those offenses. There have been eleven such murder convictions and twelve such sentencing proceedings under the present death penalty statute. On five occasions, including that of Appellant, the accused was sentenced to death. In two cases juries were deadlocked, which resulted in life sentences being imposed. In five cases the sentencing authority determined that the mitigating circumstances outweighed the aggravating factors. However, in two of the cases where a death sentence was imposed the sentence was vacated for a reason which invalidates use of the sentence for comparability purposes.

The two cases are those of *Lawrence Johnson* and of *Marselle Jerome Bowers*. In each case the sentencing authority failed to find as a mitigating factor the absence of

any prior conviction for a crime of violence although the existence of this mitigating factor was uncontradicted on the record. For that reason the convictions were reversed. *See Johnson v. State, supra,* 292 Md. 405, 439 A.2d 542 and *Bowers v. State,* 298 Md. 115, 468 A.2d 101 (1983). In those two cases the failure to find the uncontradicted mitigating factor resulted in the absence of any mitigating factor, as reflected by the verdict sheet, so that, within that erroneous framework, there was nothing to outweigh an aggravating factor and a death sentence was the only legally possible outcome under the statute. This Court has determined that the death sentences in those cases were based on an erroneously circumscribed set of mitigating factors. This error went to the very essence of the sentence imposed. Consequently, we cannot consider either *Johnson* or *Bowers* as representing what a Maryland sentencing authority has done in an actual case and those two sentences of death are not in "similar cases." The inventory to which Annette's case will be compared consists of nine cases.

*Donald Thomas Maziarz.* Maziarz, who was three weeks shy of his twentieth birthday at the time of the offense, was sentenced to death by a judge of the Circuit Court for Prince George's County. Maziarz and several others had gathered in the victim's apartment, drinking until early morning. Subsequently Maziarz asked the victim to have sex with him but she refused. Maziarz then beat and raped the victim, after which his co-defendant raped her. The victim was then bound with a telephone cord. Maziarz turned on the gas stove in the kitchen and ignited matches in the living room. A fire resulted and Maziarz deliberately destroyed the smoke detector, which had been activated by the blaze. Maziarz then removed the victim's television from her apartment and left. An explosion occurred and the victim died of either smoke inhalation or extensive burns. The trial court found as aggravating factors that the murder was committed in the course of a rape, a robbery and an arson. As mitigating factors the court found the absence of any prior conviction for a crime of violence, the

defendant's diminished capacity, his youthful age (19 years, 11 months), and that Maziarz's actions were not the sole proximate cause of the victim's death. A death sentence was imposed, and although not yet reviewed by this Court, the sentence is presumptively correct. It illustrates what a sentencing authority did in that case.

*James Russell Trimble.* Trimble, who was 17 years and 8 months old at the time of the offense, was sentenced to death by a judge in the Circuit Court for Baltimore County on March 19, 1982. He was one of a group of young men who had kidnapped the 22 year old victim and another young woman. After the gang rape of the victim, Trimble clubbed her with a baseball bat and later slashed her throat to make certain that she was dead. The kidnapping constituted an additional aggravating factor. The trial court found as mitigating factors the absence of any prior conviction for a crime of violence, the youthful age of Trimble, his antisocial personality, and his history of controlled dangerous substance abuse. As in Maziarz's case, review by this Court of Trimble's conviction and sentence has not been concluded.

*Elvis Horton.* Horton, age 36 at the time of the offenses, was convicted of the rape and murder of a 12 year old girl. A jury in Baltimore City deadlocked on sentencing, so that life sentences were imposed as required by § 413(k)(2).

*John Kevin Johnson.* Johnson, age 26 at the time of the offenses, was convicted in the Circuit Court for Prince George's County. He and a companion had kidnapped a 13 year old girl in the District of Columbia and brought her to Prince George's County, where she was raped and sodomized and property in her possession taken. Johnson then fired a sawed off shotgun point blank into her back and threw her body over a bridge. A jury deadlocked.

The deadlocks in these two cases prevented any findings on matters of aggravation and mitigation. We can only assume that one or more jurors in each case determined to show mercy.

*Theodore Scott Wiener.* Wiener, 19 years and 6 months of age at the time of the offense, was convicted in a court trial in the Circuit Court for Baltimore County. He had raped his victim, a 22 year old female, and then stabbed her 101 times, nearly decapitating her. First degree rape was the only aggravating factor. The trial judge concluded that mitigating factors of lack of a record of crimes of violence, diminished capacity and youthful age outweighed the aggravating factor, so that a life sentence was imposed.

*Vincent Tito Greco, Jr.* Greco, who was 21 years and 11 months of age at the time of the offense, was convicted of the rape and strangulation murder of his girlfriend's 78 year old grandmother. As mitigating factors the trial court found the absence of any record of crimes of violence, substantially impaired capacity, youthful age, unlikelihood that Greco would engage in further criminal activity constituting a threat to society if he were treated and the treatment were successful, Greco's kindly treatment of two young witnesses to the offense after it was committed, evidence of a likelihood of rehabilitation, and apparent amenability to treatment. A life sentence was imposed.

*Jack Ronald Jones.* Jones, age 25 at the time of the offense, was sentenced by a jury in the Circuit Court for Baltimore County on October 14, 1982 to life imprisonment. The trial judge's report states that the 22 year old victim "was kidnapped, raped and murdered by the defendant and Jerry L. Beatty, 22 calibre rifle, logging chain." Aggravating factors were the kidnapping and sexual assault. The jury found these to be outweighed by the absence of a record of a crime of violence, the unlikelihood that Jones would engage in further criminal activity that would constitute a continuing threat to society, his cooperation with the police, his prior family history, including a lack of parental guidance, his attempt to reorder his life through religious counseling, the anguish a death penalty would cause on Jones' immediate family, especially his six year old son, his previous engagement in conduct which was of great service to the public and which saved lives and property, the fact

that drugs and alcohol may have contributed to the crime, and the remorse shown by Jones.

*Howard Hines.* Hines, age 25 at the time of the offense, was convicted in the Circuit Court for Prince George's County of the murder and attempted first degree rape of a 22 year old College Park student. The victim was repeatedly stabbed and was strangled and beaten. Her head and pubic hair was burned. A jury found the fourth mitigating factor (substantial impairment due to mental incapacity, etc.). There was evidence, per the trial judge's report, that Hines had a "thought disorder, bearing schizophrenic-like characteristics." A life sentence was imposed.

*Lawrence Johnson.* Following the vacating of Johnson's death sentence (292 Md. 405, 439 A.2d 542) he was sentenced to life imprisonment at a nonjury proceeding in the Circuit Court for Charles County. Johnson had not reached his 19th birthday at the time of the murder. The sentencing judge found five mitigating circumstances. These included lack of any prior conviction for a crime of violence, acting under substantial duress or domination of another person, the substantial impairment of Johnson's capacity to appreciate the criminality of his conduct and youthful age. Johnson had also been accused of having participated in another murder for which his co-participant received a life sentence. This disposition was found to be a fifth mitigating circumstance as to Johnson by the Charles County court.

Appellant urges that the sentence of death imposed on her is necessarily disproportionate and excessive because Bernard Lee Stebbing was sentenced to life imprisonment for the murder of Dena Polis. Bernard, however, was a principal in the second degree to Dena's murder and was not eligible under § 413(e)(1) for the death penalty. A similar reason excludes the case of William Joseph Parker, relied upon by Appellant, where a life sentence was imposed in the Circuit Court for St. Mary's County on May 15, 1979. While convicted of murder, Parker was convicted of rape in the second degree. Thus, there was no aggravating factor

which would raise that murder to capital murder.[12] Dean Hugh Oliver's convictions of murder, attempted rape and first degree sexual offense, which resulted in a life sentence and to which Appellant refers, do not present a similar case. The sentencing jury found no aggravating circumstances. Only the victim, Oliver and a co-principal who testified against Oliver were present at the crimes. The jury was apparently unable unanimously to find beyond a resonable doubt that Oliver was a principal in the first degree to the murder.

It is noteworthy that Trimble, who is under sentence of death, was about two years younger than Annette, and unmarried, when he committed murder and rape. Donald Maziarz, who is also under a sentence of death, was eight months older than Annette at the time he committed murder, robbery and rape. Unlike Annette, however, Maziarz was unmarried.

In the five cases of life sentences where verdict sheets were completed, the mitigating factors, articulated by the sentencing authorities and found in those cases to have outweighed the aggravating factor, reflect the channelized discretion which is the object of a modern death penalty statute and not the disparity that would annul the sentence in the case at bar. *See Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929, 939 (1976). From the standpoint that the victims in the Horton and John Kevin Johnson cases were children, those cases might be viewed as more heinous. However, if "the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice," *see Gregg v. Georgia,* 428 U.S. 153, 203, 96

---

12. We interpret the reference in § 413(d)(10) to "robbery, arson, or rape or sexual offense in the first degree" as specifying both rape and sexual offense in the first degree. Otherwise, if "in the first degree" modified only "sexual offense," then the section would read "robbery, arson, rape or sexual offense in the first degree." In any event, ambiguity must be construed against the State.

S.Ct. 2909, 2939, 49 L.Ed.2d 859, 891 (1976), the individual decisions to show mercy by one or less than all of the jurors in those two cases, which caused deadlocks, do not render the subject sentence excessive or disproportionate.

Having reviewed findings, sentencing reports and opinions in similar cases, we conclude that, considering both the crimes and the defendant, the sentence of death in the instant case is not excessive or disproportionate.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED, WITH COSTS.

ELDRIDGE, Judge, dissenting.

In several respects, I do not agree with the majority's opinion in this case. First, while the court correctly affirms Annette's first degree felony murder conviction, I cannot concur with some of the majority's reasoning. Furthermore, the majority's conclusion that Annette's death sentence withstands proportionality review under the Maryland Death Penalty Statute, Art. 27, § 413(e)(4), is erroneous. Finally, the majority errs in holding that the commission of rape, robbery, arson, or other specified crimes, as a principal in the second degree, constitutes an aggravating circumstance under § 413(d)(10). I would vacate Annette's death sentence and remand for the imposition of a sentence of life imprisonment.

## I.

With regard to affirmance of Annette's conviction for first degree felony murder, the majority relies on *Johnson v. State*, 292 Md. 405, 439 A.2d 542 (1982), to sustain the trial court's exclusion of an expert opinion that Annette lacked the requisite intent. The majority cites *Johnson* for the proposition that "diminished capacity is not a defense," and then holds that, in light of this proposition, the trial court did not err.

I continue to adhere to the view expressed in my dissenting opinion in *Johnson*, 292 Md. at 446, 439 A.2d 542, that

"evidence of . . . mental condition . . . [is] admissible for the purpose of showing the absence of certain elements of first degree murder and of the other specific intent crimes . . . ." This is not, however, the principle which is dispositive of this issue. Rather, the controlling rule is that an expert cannot express his opinion as to whether the defendant did or did not intend the wrong allegedly committed. *Rhodes v. United States,* 282 F.2d 59, 62 (4th Cir.), *cert. denied,* 364 U.S. 912, 81 S.Ct. 275, 5 L.Ed.2d 226 (1960); *State v. Donahue,* 141 Conn. 656, 109 A.2d 364, 368–369 (1954), *appeal dismissed and cert. denied,* 349 U.S. 926, 75 S.Ct. 775, 99 L.Ed. 1257 (1955); *Koester v. Commonwealth,* 449 S.W.2d 213, 215–216 (Ky.1969); *State v. Mitter,* 285 S.E.2d 376, 379–380 (W.Va. 1981).

As the trial judge allowed evidence bearing on mental capacity, and refused only opinion evidence on the ultimate issue of intent, his evidentiary ruling was proper.[1]

## II.

Even though Annette's conviction for felony murder should be upheld, the death sentence imposed should be set

---

1. Some of the majority's conclusions with respect to Annette's "conviction" for robbery are also doubtful. It is difficult to agree that, as to Dena's clothes, Annette committed robbery, because it is unclear whether a felonious taking in fact occurred. The majority disposes of this issue by citing the general rule that, in order to establish a felonious taking, it is not necessary that the taker gain pecuniary advantage. *Canton Bank v. Am. Bonding Co.,* 111 Md. 41, 45, 73 A. 684 (1909). While this rule is certainly viable, it is questionable whether it was ever intended to reach a situation such as the one at hand. Clearly, a felonious taking occurs where a person takes property for temporary use and then disregards it, or takes property for the purpose of giving or selling it to another. *See Hadder v. State,* 238 Md. 341, 354–356, 209 A.2d 70 (1965). It is less certain, however, that a felonious taking exists where clothes are stripped from a body during the course of a rape, and then discarded shortly thereafter to conceal evidence of crime. *But cf. People v. Green,* 27 Cal.3d 1, 164 Cal.Rptr. 1, 609 P.2d 468 (1980). To embrace this approach, as the majority has done today, is to acknowledge that almost every cover-up of evidence of a crime is a robbery. I am not convinced that common law robbery was ever intended to extend this far.

aside. Because the death penalty is "excessive" and "disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant," § 413(e)(4), the death sentence should be vacated and the case remanded to the trial court for the imposition of a sentence of life imprisonment.

In order to conduct a thorough proportionality review, the Court must consider all the facts and circumstances underlying the defendant's case. In Annette's case, the relevant facts are as follows. First, the jury was unable to find Annette guilty of willful, deliberate, and premeditated murder, but rather convicted her only of felony murder. Second, as the trial judge recognized, Annette was not the primary instigator of the criminal activity. Rather, there was evidence to show that she acted under the influence of and was dominated by her husband, Bernard Lee Stebbing. In addition, Annette was diagnosed as having a personality disorder and borderline intelligence. She was only 19 years of age when she committed the crime and had never previously been convicted of a crime of violence. Finally, while Annette was found to be a principal in the first degree to murder, she was only an aider and abettor with regard to at least two of the underlying felonies which were found to be aggravating circumstances under § 413(d).

This Court has defined the inventory of similar cases to be considered for proportionality review as those cases in which the State sought the death penalty, along with any other similar murder cases presented by the defendant. *See Colvin v. State,* 299 Md. 88, 116, 472 A.2d 953 (1984); *Calhoun v. State,* 297 Md. 563, 610, 468 A.2d 45 (1983); *Tichnell v. State,* 297 Md. 432, 464–466, 468 A.2d 1 (1983). While the case of Annette's husband, Bernard, is not technically "similar" because he was not a principal in the first degree to murder and thus was not eligible for the death penalty, *see* Art. 27, § 413(e)(1), his case is not entirely irrelevant for purposes of proportionality review. Rather, the relationship of Annette and her husband to each other, and to the

criminal activity in which they were involved, is particularly significant when comparing Annette's case to other cases in which the defendant was eligible for the death penalty. Of primary importance is the fact that Bernard Lee Stebbing was the chief perpetrator of the criminal enterprise which resulted in the death of the victim. Bernard, who was considered by the trial judge to be "equally if not more involved" in the crime, was given a sentence of life imprisonment. Annette, on the other hand, was sentenced to die.

Never before under Maryland's current death penalty statute has a subservient actor to criminal activity resulting in murder been sentenced to death, where the dominant figure in the criminal scheme received a lesser sentence. For example, in the case of Lawrence Johnson (Charles County Criminal Case No. 82–78), the defendant was sentenced to life imprisonment after his conviction for both first degree rape and murder as a principal in the first degree. An important factor in the sentencing determination was that the Johnson's co-defendant, who masterminded the criminal enterprise, was given a sentence of life imprisonment. In the case of Glenn Sturgis, the defendant was given life imprisonment as a result of a deadlocked jury. Nevertheless, the court stated that even if the court had conducted sentencing, death would probably not have been imposed because Sturgis's co-defendant, who was considered to be equally guilty, had received a life sentence as a result of a plea. The treatment accorded the other actors in the criminal enterprise was also a factor in the case of Robert Lee Myers. In *Myers* the trial judge sentenced the defendant to life imprisonment after finding as mitigating circumstances the fact that one of Myers's co-defendants was given a life sentence and the other was granted immunity from prosecution. Unlike in *Johnson* and *Sturgis,* the defendant in *Myers* was the dominant actor in the criminal scheme.

In Annette's case, the trial judge, upon finding that the mitigating circumstances did not outweigh the statutory

aggravating circumstances,[2] sentenced Annette to death. In so doing the trial judge acknowledged the potential significance of Bernard's life sentence in light of his participation in the criminal scheme. He stated:

"Your husband, Bernard Stebbing, was convicted in Wicomico County and received a life imprisonment. Perhaps appropriately so, the death penalty was not before the Court; *and to that extent, since I consider him equally if not more involved, . . . there could be a disparity in the findings of this Court.* That has nothing to do with the case. This Court bases its judgment on what was before it alone." (emphasis added).

Unlike the trial court, this Court, for the purposes of proportionality review, is obliged to look beyond the facts of the instant case and consider other cases in relation to the one at hand. In my opinion, the fact that Annette's husband received a life sentence for his dominant role in the crimes, is a major obstacle to a finding that Annette's death sentence is proportionate to the sentences in similar eligible cases.

Moreover, apart from the fact that the dominant perpetrator of the criminal enterprise received a life sentence, Annette's death sentence is still disproportionate to the sentences imposed in other sex-related murder cases. The majority finds nine cases to be comparable to Annette's case for purposes of its proportionality review. Of those nine, two resulted in the imposition of a death sentence by the court or jury. As those cases, *State v. David Thomas Maziarz* and *State v. James Russell Trimble,* have yet to be reviewed by this Court, they are not particularly relevant to the proportionality determination.

In the other seven cases noted by the majority, the sentencing authority imposed life imprisonment. The defendants in those cases were between the ages of eighteen and thirty-six. Annette was nineteen years of age when she

---

**2.** *See* note 6, *infra.*

committed the crime. She was diagnosed by her doctors as having a borderline personality disorder, and she has a recorded history of learning disabilities. In all of the cases reviewed by the majority, the defendants committed the murder and rape or attempted rape of their victims as principals in the first degree. Annette was a principal in the first degree to murder but a principal in the second degree to the rape and the sexual offense.

In three of the seven cases where life imprisonment was imposed, the defendants Elvis Horton, John Kevin Johnson, and Howard Hines, had criminal records involving prior "crimes of violence" or other serious crimes. Both Horton and Hines had previously been convicted of rape or assault with intent to rape, along with several crimes involving the use of a deadly weapon. In addition, Johnson was found to have bragged about his killing to five witnesses, and then attempted to contract for several of their murders. Annette has not previously been convicted of a crime of violence. Unlike the seven cases considered by the majority, in the present case it is unclear precisely what events precipitated the victim's death. Furthermore, the jury was unable to find that Annette willfully, deliberately, and with premeditation, murdered the victim; the jury found only felony murder.

The crimes committed by Annette and her husband were horrible, and I do not intend to minimize that fact. Nevertheless, the horrible nature of the criminal enterprise is not the statutory basis for our review of the death penalty. Instead, the question is whether the death sentence is disproportionate to the sentences imposed in similar cases. Comparing this case to similar cases, all involving sentences of life imprisonment, compels the conclusion that the death sentence here is disproportionate.

### III.

Even if the majority were correct in holding that Annette's death sentence is not disproportionate to that im-

posed in similar cases, Annette's case should nevertheless be remanded to the trial court for further consideration of the sentence. A defendant is only eligible for the death penalty where at least one of several statutory aggravating factors is found to exist beyond a reasonable doubt, *Tichnell v. State, supra,* 287 Md. at 729, 415 A.2d 830. In the present case, the jury found Annette guilty of rape, sexual offense and robbery, and the trial judge apparently relied on all three felonies as aggravating circumstances, pursuant to § 413(d)(10).[3] Annette was a second degree principal with respect to at least two of these crimes. Despite Annette's status as a second degree principal to these crimes, the majority concludes that they were aggravating circumstances under § 413(d)(10). I disagree.

Under the plain language of the statute, if a crime listed in § 413(d)(10) is the sole aggravating circumstance relied upon, the sentencing authority may only consider imposition of the death penalty if the defendant is a principal in the first degree to both the murder and the underlying aggravating crime. Since Annette was only convicted of rape and sexual assault as a principal in the second degree, these crimes can not properly serve as aggravating factors under § 413(d)(10). Moreover, since the trial record does not indicate whether Annette was found guilty of robbery as a

---

3. Section 413(d)(10) covers the only aggravating circumstances relied upon by the trial judge. That portion of the Maryland Death Penalty Statute provides as follows:

"(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:

\* \* \* \* \* \*

"(10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree."

Furthermore, § 413(f) provides:

"(f) *Finding that no aggravating circumstances exist.*—If the court or jury does not find, beyond a reasonable doubt, that one or more of these aggravating circumstances exist, it shall state that conclusion in writing, and the sentence shall be imprisonment for life."

principal in the first or second degree, it is uncertain whether she is even eligible for the death penalty. Accordingly, the case should be remanded to the trial court for a determination of this issue.[4]

As stated above, the plain language of § 413 compels the conclusion that one must be a principal in the first degree to one of the crimes listed in § 413(d)(10) for that crime to constitute an aggravating circumstance. Moreover, absent an indication that the statutory terminology was intended to take on a special meaning, the Court must give effect to the plain and ordinary sense of words chosen; there is no need to look further or consider rules of statutory construction. *See Ryder Truck Lines v. Kennedy,* 296 Md. 528, 535–536, 463 A.2d 850 (1983); *Blum v. Blum,* 295 Md. 135, 140, 453 A.2d 824 (1983); *Mauzy v. Hornbeck,* 285 Md. 84, 93, 400 A.2d 1091 (1979), and cases cited therein.

Aggravating circumstance number ten, relied on in this case, is that "the defendant committed the murder while committing or attempting to commit robbery, arson, rape or sexual offense in the first degree." The word "defendant" at the beginning of the sentence is the subject of the phrase "committed the murder" as well as the phrase "while committing or attempting to commit robbery, arson, rape or sexual offense in the first degree." Section 413(e) provides that, except for the purposes of subsection (d)(7), the terms "defendant" and "person" as used in the section "include only a principal in the first degree."[5] Accordingly, each

---

4. If Annette is a second degree principal to the robbery, then no crime has been committed which can serve as an aggravating factor under § 413(d)(10), and Annette is not eligible for the death penalty. Should a determination be made that she was a first degree principal to robbery, § 413(d)(10) is satisfied, and she may be eligible for the death penalty. In the latter situation, a new sentencing hearing should still be given so that the sentencing authority can consider and give proper weight to the fact that the only aggravating factor is robbery, and not rape, sexual offense, and robbery.

5. Section 413(e) reads in part as follows:

time the word "defendant" or "person" appears in the section we are to replace it with the phrase "principal in the first degree." Substituting this definition wherever the word "defendant" is implicated in § 413(d)(10), the tenth aggravating factor is necessarily limited to that situation where a party commits murder as a first degree principal while also committing one of the enumerated crimes as a first degree principal.

Nowhere in § 413(e) is the definition of "defendant" or "person" limited to a first degree principal to murder only. Had the Legislature intended such a result, it could either simply have said so, or have included this limitation in § 412 or § 413(a) where the general prerequisites for death penalty eligibility are specified. The Legislature did neither of these things. Instead, it positioned the definition of "defendant" or "person" at the end of § 413, and stated that all references to "persons" or "defendants" in § 413 "include only" those who are first degree principals with respect to all crimes enumerated in the section.

It is especially significant that where the Legislature saw fit to make an exception to this definition of "defendant," it expressly did so, as evidenced by the exclusion of subsection (d)(7) from the general definition. The fact that the Legislature expressly provided for an exception suggests that no others were intended. *Pennsylvania Nat'l Mut. v. Gartelman,* 288 Md. 151, 156, 416 A.2d 734 (1980).

---

"(e) *Definitions.*—As used in this section, the following terms have the meanings indicated unless a contrary meaning is clearly intended from the context in which the term appears:

(1) The terms 'defendant' and 'person,' except as those terms appear in subsection (d)(7), include only a principal in the first degree."

Subsection (d)(7), which is excepted from the first degree principal requirement of § 413(e)(1), provides that it is an aggravating circumstance for one to contract for the murder of another. The seventh aggravating factor reads as follows:

"(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration."

Furthermore, there is nothing in the legislative history to contradict this construction. The 1977 Senate version of Maryland's Death Penalty Statute, S.B. 374, which received an unfavorable report from the Senate Judicial Proceedings Committee, 1 *Maryland Senate Journal* 861–62 (1977), did not contain a definition of "defendant" or "person" for the purposes of § 413. Instead, the 1977 version defined only the term "committed," and then only for the purpose of § 413(d). The term "committed," as used in that subsection of the 1977 bill, meant "aided, abetted, or counseled." Thus, under the 1977 draft, one who aided or abetted in a murder while also aiding or abetting a completed or attempted robbery, arson, rape, or other enumerated offense, would satisfy that aggravating circumstance of § 413(d).

The current death penalty statute (which also originated as S.B. 374), as first presented to the Legislature in 1978, did not include a definition of "committed." According to the Maryland Attorney General, further amendment was desireable to clarify the Legislature's intent in omitting this definition.[6] Thus, in its final form, the statute included a definition of the terms "defendant" and "person" which restricted their meaning to principals in the first degree. There is no suggestion that the Legislature intended to restrict the first degree principal requirement to commission of the murder only. To the contrary, this change reflects the Legislature's desire to substitute the phrase "principal in the first degree" for the words "defendant" or "person" wherever they appear in the text of § 413.

The majority, in ignoring the plain language of the statute, suggests that because the aggravating circumstances include both consummated and attempted felonies, and since attempted felonies are misdemeanors which, at common law, are not divided into first degree and second degree principals, the Legislature could not have intended to make the

---

**6.** *See* Letter from Attorney General Francis B. Burch to Acting Governor Blair Lee III, dated January 24, 1978, contained in the file of the Department of Legislative Reference.

distinction between degrees of principals in relation to § 413(d)(10). This conclusion is simply not sound. First, as the majority points out, an attempt is a common law misdemeanor, an offense which traditionally is of a less serious nature. By including certain attempts as aggravating circumstances for purposes of the death penalty, the Legislature has already altered the less serious treatment given to attempts at common law. Furthermore, there is nothing to prevent the Legislature from distinguishing between those aiding and abetting an attempted felony and those attempting to actually perpetrate the felony but failing prior to completion. This is precisely what the Legislature resolved to do by limiting the scope of the term "defendant" in § 413(d)(10) to an actor who committed both murder and a completed or attempted felony as a principal in the first degree.[7]

Judge COLE has authorized me to state that he concurs with the views expressed herein. Judge DAVIDSON has authorized me to state that she concurs with the views expressed in Part I of this dissenting opinion.

DAVIDSON, Judge, dissenting.

I adhere to my view expressed in my dissenting opinion in *Tichnell v. State,* 297 Md. 432, 485–94, 501–02, 468 A.2d 1,

---

7. Even if § 413 were not limited to principals in the first degree, the fact that Annette was a principal in the second degree to both the rape and sexual offense should, at the very least, have been taken into account when the trial judge weighed the mitigating circumstances against the aggravating circumstances. There is no indication as to the degree of weight given to each aggravating and mitigating factor found by the trial judge. It is clear, however, that the trial judge was required to consider the quality of each factor, and not simply to aggregate the factors. *See Hargrave v. State,* 366 So.2d 1, 5 (Fla.1978), *cert. denied,* 444 U.S. 919, 100 S.Ct. 239, 62 L.Ed.2d 176 (1979) ("The statute does not comprehend a mere tabulation of aggravating versus mitigating circumstances to arrive at a net sum. It requires a weighing of those circumstances.") Certainly, in looking at the aggravating factors, the trial judge should have considered that Annette aided or abetted in the rape and sexual offense, and did not commit these crimes as a principal in the first degree.

26–31, 34–35 (1983) (Davidson, J., dissenting) (*Tichnell III*) that the legislative history and legislative purpose of Maryland Code (1957, 1982 Repl.Vol.), Art. 27, § 414(e)(4) require the term "similar cases" to be construed to include not only those first degree murder cases in which the State sought the death penalty whether it was imposed or not, but also those other death eligible murder cases in which the prosecutor could have but did not seek the death penalty. Accordingly, I respectfully dissent from that portion of the majority opinion upholding the imposition of the death penalty. I would vacate the death sentence and remand for the imposition of the sentence of life imprisonment.